IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Skybridge Spectrum Foundation,[1] | ) | Case No. 16-10626 (CSS) |
| | ) | |
| Debtor. | ) | |

**DECLARATION OF WARREN C. HAVENS IN SUPPORT OF THE DEBTOR'S CHAPTER 11 PETITION AND REQUESTS FOR FIRST DAY RELIEF**

I, Warren C. Havens, hereby declare under penalty of perjury, pursuant to section 1756 of title 28 of the United States Code, as follows:

## INTRODUCTION

1. I am the President, sole director, and sole member of Skybridge Spectrum Foundation, a Delaware nonstock nonprofit corporation ("Skybridge," "SSF," or the "Debtor"). I have served in these roles from the formation of SSF in 2006 to this day (except during the course of a recent receivership). I am familiar with SSF's day-to-day operations, business, and financial affairs.

2. On March 11, 2016 (the "Petition Date"), I caused SSF to file a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

3. I attended Saint John's College in Santa Fe, NM and UCLA for studies in, among other things, the humanities and nonprofit organizations. I have received training with business and technical experts in apprentice relations. Prior to 1999, I was involved in wireless telecommunications primarily as a founder, substantial owner, and Vice President of Highland Cellular, Inc., a cellular operating company. At Highland, among other things I was in charge of the overall technical plans and implementation, major aspects of the business plans, and financing negotiations and arrangements.

---

[1] The last four digits of the Debtor's federal tax identification number are 8487. The Debtor's mailing address is 2509 Stuart Street, Berkeley, CA 94705.

4.  Starting in 1999, I began forming a series of related companies that are involved in new forms of wireless services and technologies. SSF is a tax-exempt section 501(c)(3) private operating foundation. It has no paid employees or payroll. These Delaware entities include SSF and seven limited liability companies (the "JV LLCs").[2] See Figure 1. In addition to its principal property, its FCC licenses and related intangible assets in the SSF JV Plan opportunities, and its cash reserves, SSF (i) holds substantial ownership interests in Environmentel LLC, one of the JV LLCs, which in turn holds membership interests and debt in most of the other JV LLCs,[3] (ii) holds contractual rights,[4] and (iii) holds substantial litigation claims.

5.  Since then, I have been employed in each of these as president, as well as in other roles, on a full-time-plus basis (except for recent months during a receivership). I have expertise in the technical, market, nonprofit, and regulatory aspects the SSF JV Plan (described below), including the nature and benefit of "public-private-nonprofit partnerships" designed to meet the nation's needs for "smart" infrastructure and services, environment monitoring, and protection. At SSF and the JV LLCs, I conduct research and development with many experts in wireless and provide executive leadership providing the companies with a coherent strategy for development

---

[2] The JV LLCs are the following Delaware companies: (1) Telesaurus Holdings GB LLC ("THL") (2) Verde Systems LLC ("VSL"), (3) Environmentel LLC ("ENL"), (4) Enironmentel-2 LLC ("ENL2"), (5) Intelligent Transportation & Monitoring Wireless LLC ("ITL"), (6) V2G LLC ("V2L") and (7) ATLIS Wireless LLC ("AWL").

[3] More precisely: (i) SSF owns B, AB, and B2 Series interests in Environmentel LLC ("ENL"). The B and AB Series, partly owned by SSF, have capital and profits interests. The B2 Series, fully owned by SSF, has a secured capital account currently at its maximum level (a seven-figure sum), entitled to distributions up to this sum. (ii) ENL has substantial loans outstanding to other JV LLCs (in the seven-figure range in total), to VSL, THL and ITL payments of which support the ENL B, AB, and B2 Series interests held by SSF. (iii) ENL (a) fully owns ENL2, (b) holds majority member ownership interests in AWL, and (c) holds minority member ownership interests in VSL, THL, and ITL. See the legend in Figure 1 for these acronyms.

[4] SSF is a party to a contract or contracts that have been negotiated but have not yet closed with several large companies for sale of portions of several of SSF's FCC licenses in the seven-figure range. One of these sales involves both SSF and VSL, and another potentially involves both SSF and ENL. These transactions, that are time-sensitive as to pre-closing required tasks, are in jeopardy on account of the actions and inaction of the Receiver. On information and belief, the Receiver is holding the documentation relating to these deals and has failed to surrender it despite repeated post-petition demands.

and implementation to meet the nation's needs for "smart" infrastructure. Typically, these strategy decisions are reflected piecemeal in separate public filings before the Federal Communications Commission ("FCC").

6. I have a lifelong interest in nonprofits. All of my services to SSF up through commencement of the recent receivership have been as a volunteer. I have received no cash or in-kind consideration. In addition, I have donated to SSF, as outright charitable gifts, cash and a large percent of my personal assets probably currently worth a 9-figure sum according to expert appraisals.

7. SSF holds exclusive licenses issued and regulated by the FCC providing nationwide coverage in parts of the 40 MHz, 200 MHz, and 900 MHz radio-frequency bands. The JV LLCs also hold licenses for these three "spectrums." With these licenses, SSF is engaged in joint venture plans and developments to provide to the nation, with no cost for the essential services, critical radio-based positioning, navigation and timing ("PNT") services with high accuracy and precision ("pPNT") (the "SSF JV Plan"). The plan will use and augment US Global Positioning System ("GPS") and the other Global Navigation Satellite Services ("GNSSs"), and can also operate independently.[5]

8. The nation's need for "smart" or "intelligent" positioning, navigation and timing capabilities to service critical applications in transportation, energy systems, agriculture, natural resource industries, other critical service industries, and to monitor and protect the natural environment cannot be met without pPNT. These are among the most important undertakings taking place globally by governments, nonprofits, and private companies, often in cooperative relations for public safety and health, preservation of resources, reduction of pollution and global

---

[5]GPS and other GNSS that are not augmented by pPNT are not sufficiently accurate for "smart" infrastructure. Moreover, they are easy to jam and spoof, or disrupt in space by an adversary. The pPNT described herein is reliably accurate, and will have coverage in virtually all of the nation, to an exactness of several-to-ten centimeters, approximately, and can be configured to an accuracy level required by the application it supports.

warming, and improved quality of life. To the best of my knowledge, no other venture beside SSF and the JV LLCs has obtained the crucial foundation for these applications -- a nationwide licensed radio spectrum and related technology -- in the United States.[6]

9. The acquisition of the SSF and the JV LLCs' FCC licenses is depicted in Figure 2.

10. Unlike commercial companies that exist to seek profit, distributions, and stock appreciation for their private shareholders, a nonprofit POF like SSF exists to serve public-interest purposes for its stakeholders: the participating government programs and, through them, the general public. As nonprofit POF, SSF supplements the work of government in meeting critical public needs, which is the reason the IRS has granted SSF tax-exempt status.[7]

---

[6] Licensed radio spectrum is required in suitable quantities and ranges, with nationwide coverage, and cleared of encumbrances, along with related advanced wireless technologies and systems. In late 2014, after 15 years of assiduous effort, SSF and the JV LLCs achieved this goal. See Figure 2. For further descriptions and depictions of the need, components, and implementation methods of the SSF JV Plan for nationwide pPNT drawing from government and industry expert materials, including a glossary of terms, see the Appendices, esp. Appendix A.

[7] In a previous year, the IRS erroneously revoked SSF's tax-exempt status. The IRS corrected the error after SSF submitted proof of timely filing of tax return, thereby reinstating SSF's tax-exempt status without discontinuation. The same drill is currently re-occurring.

Figure 1



SSF & SSF JV LLCs  -  Formation & JV Development

2007 forward: AWL provides administrative services to these license-holding LLCs

1999 — VSL
2001 — THL
2004 — ENL & ENL2
2005 — ITL
2006 — SSF
2007 — AWL
2010 — V2L

Charitable donation assignments of portions of licenses from the LLCs to SSF in various years.

**SSF JV Plan**, principal actions:
(1) License assignments noted above. (2) Under the assignments and certain FCC rules, SSF assumes FCC license "construction" obligations of the LLCs donors. (3) SSF to partner with government, others, to meet the these obligations (see Appendices A, A2), for pPNT-based advanced wireless (Appendix A), after the end of "Phase 1" which is now completed (see Figure 2 and text below). SSF, a nonprofit, was formed for this purpose. (4) "Phase 2" began in late 2014 then stopped and reversed by the Receivership.

VSL -  Verde Systems LLC
THL -  Telesaurus Holdings GB LLC
ENL -  Environmentel LLC
ENL2 - Environmentel-2 LLC (sub. of ENL)
ITL -  Intelligent Transportation & Monitoring Wireless LLC
SSF -  Skybridge Spectrum Foundation
AWL -  ATLIS Wireless LLC
V2L -  V2G LLC

Years, above means year that the entity was formed and initially capitalized.

VSL was initially called Telesaurus VPC LLC.   ENL was initially called AMTS Consortium LLC

Figure 2



"**Phase 1**" - acquisition & clearance, is up to the time of the nationwide joint venture(s) with government, other nonprofits, and other commercial companies. "**Clearance of encumbrances**" means (i) clearing the FCC radio-spectrum licenses from 3rd party claims to major geographic areas, and (ii) prevailing in FCC rule-change proceedings that put a cloud on best use of the spectrum, and posed uncertainties re permitted and required technology and uses: see Appendix C and text below.

## THE TWO PHASES OF THE SSF JV PLAN

11. The business plan consists of two distinct phases.

12. In Phase I, SSF and the JV LLCs first obtained the FCC licenses depicted in Figure 2 in a series of FCC public competitive auctions described in Appendix B. SSF obtained the majority of its FCC licenses (by quantity of licenses, and by quantity of radio spectrum) via charitable-donation assignments from the JV LLCs, and obtained the rest by direct acquisition from the FCC at auction.

13. Because substantially all of these licenses and/or radio spectrum in the licenses

were subject to third-party claims and/or FCC rule-change proceedings (together, "encumbrances") as noted in Figure 2, the licenses were obtained in these auctions at low prices relative to their potential value when these encumbrances were later cleared off.

14.  When these licenses were initially obtained, SSF and the JV LLCs believed that they could permanently clear off all or most of the encumbrances with proper legal actions before the FCC and courts. They succeeded in this as indicated in Figure 2, where by late-2014 approximately 98% of the encumbrances had been cleared by final actions in FCC orders and decisions, and court settlements. See Appendix C. This improved the value of the licenses, along with value appreciation by other lesser factors, over a hundred fold.

15.  A further successful aspect of Phase 1 was the research leading to successful FCC applications to obtain grants of "Private Commons"[8] status for the majority of the radio spectrum held by SSF and the JV LLCs, their LMS class licenses. This achievement represents the first FCC grant of Private Commons status.

16.  It took 15 years of extraordinary effort and persistence to complete the many components of Phase I.

17.  In Phase II, which commenced in late-2014, SSF and the JV LLCs commenced joint-venture arrangements with government agencies and industry entities interested or becoming involved with the SSF JV Plan and pPNT and, in particular, achieving this nationwide. Highly promising projects are well underway with certain federal agencies. See Appendix A, A.2.

18.  The three largest projects are (i) nationwide pPNT wireless in support of and using existing nationwide infrastructure of the US NOAA (its CORS and other facilities), (ii) nationwide

---

[8] Private Commons involves advanced wireless technologies and systems, using mesh-net peer-to-peer methods, under contracts between the licensee and major end-users (such as government and large companies) where the licensee defines and coordinates the end users' use of the spectrum to maximize effectiveness and efficiencies not possible with exclusive-license, exclusive-use systems, or with uncoordinated multi-user systems and methods, called "public commons," such as employed in WiFi. See Appendix C.

7

40 MHz range "skywave" pPNT-centric wireless, in large part using new-generation "meteor burst" communications and radiolocation methods (with integrated 200 MHz and 900 MHz) in support of and extending the nationwide similar skywave systems in operation by the US DOA, and (iii) Pacific-Coast states (California, Nevada, Oregon and Washington; with plans to expand nationwide) advanced high-bandwidth multi-band, 40 MHz, 200 MHz, and 900 MHz wireless for environment monitoring and protection, and improved seismic science and public alerts, in support of and extending the existing programs and wireless and monitoring facilities of the Universities of California, Nevada, Oregon, and Washington, which, in turn, have support from federal agencies including the USGS and USFS.[9]

## EVENTS LEADING TO THE COMMENCEMENT OF THE CHAPTER 11 CASE

19.    Requested during the spring of 2015 but not becoming effective until on or about November 18, 2015, SSF and the JV LLCs were placed into an improvidently granted receivership pursuant to order of the State of California Superior Court for the County of Alameda in Case No. 2002-070640, *Leong v. Havens* (the "Receivership"). Receiver Susan L. Uecker is administering the Receivership as one combined venture.

20.    The Receiver has abandoned and reversed the principal strategic objectives that SSF and the JV LLCs had commenced jointly to maintain, improve, and use their respective FCC licenses for a common business plan and future developments, the SSF JV Plan, and evidently seeks to liquidate the companies' assets regardless of consequence. These actions, before the FCC and otherwise, have significantly damaged the SSF JV Plan and have jeopardized all of the FCC licenses of SSF and the JV LLCs. If left unchecked, the Receiver's actions would surely ruin SSF and the SSF JV Plan, and waste the best use and value of the FCC licenses involved.

21.    At the same time, the Receiver has incurred enormous expenses.

---

[9] Elements of these projects are described in Appendices A and A.2.

22. Through chapter 11 reorganization, SSF intends to preserve the going concern value of its estate, thereby maximizing the value of its assets for the benefit of all creditors. SSF intends to resume its operations pursuant to the SSF JV Plan, including by renewing and protecting the licenses, and by resuming management of its nationwide network of interrelated FCC licenses, including implementing its business plan via "public-private-nonprofit partnerships" in fulfillment of its public interest charter.

23. On account of the Receivership, the Debtor is dispossessed of its assets as well as information relating to the Receiver's activities that may impact its books and records. Despite repeated post-petition demands, the Receiver has failed to turn over such assets and provide an accounting. Moreover, a critical deadline for the renewal of 704 FCC "MAS" licenses, 352 of which are the exclusive property of SSF, is set for March 29, 2016.

## FIRST DAY PLEADINGS

24. The Debtor is filing relatively few "First Day Motions," but may be seeking other expedited relief. The Debtor anticipates that the Court will conduct a hearing soon after the commencement of the Debtor's chapter 11 case (the "First Day Hearing"), at which time the Court will hear the First Day Motions. For those motions being heard at the First Day Hearing, the relief requested therein is necessary and appropriate under the circumstances as the Debtor will suffer irreparable harm if any of the relief requested is not granted.

25. Generally, the First Day Motions have been designed to meet the goals of: (a) continuing the Debtor's operations in chapter 11 with as little disruption and loss of productivity as possible; (b) maintaining the confidence and support of the Debtor's project partners and certain other key constituencies; and (c) establishing procedures for the smooth and efficient administration of this case.

26. I have reviewed each of the First Day Motions, including the exhibits thereto, and I believe that the relief sought in each of the First Day Motions is tailored to meet the goals described above and, ultimately, will be critical to the Debtor's ability to achieve a successful reorganization. I also believe that the matters addressed in the First Day Motions are of a genuinely emergent nature, and that the relief requested in the First Day Motions is required to preserve the assets of the Debtor's estate and to maintain the Debtor's ongoing business operations. Moreover, I believe, as further described below, that the failure to immediately address the issues set forth in the First Day Motions will have extremely adverse effects on the Debtor, its estate, and its creditors.

    **A.    Motion for Entry of Interim and Final Orders: (i) Authorizing Continued Use of Accounting System and Business Forms; (ii) Authorizing Replacement of Existing Bank Account; and (iii) Waiving the Requirement of § 11 U.S.C. 345(b)**

27. The Debtor's existing QuickBooks accounting books and records system and business forms ("Accounting System") is structured to maximize efficiency within the Debtor's internal financial operations. In the ordinary course of business, the Debtor uses the Accounting System to streamline collection, transfer, and disbursement of funds generated by the Debtor's business operations.

28. Prior to the commencement of this chapter 11 case, in the ordinary course of its business, the Debtor maintained a bank account which it utilized to collect funds for its operations and to pay operating and administrative expenses in connection therewith. The bank account was maintained with Wells Fargo Bank, N.A. ("Wells Fargo"), and was designated as follows:

| Account Number | Account Name | Purpose |
|---|---|---|
| ******4797 | Skybridge Spectrum Foundation Operating | Demand deposit account for cash receipts & payables |

29. Since the intervention of the Receivership, the Debtor has been advised that the Wells Fargo bank account has been closed. Accordingly, Debtor will need to establish a

replacement account (the "Bank Account") upon resumption of its operations. The Debtor proposes to open a demand deposit account at Charles Schwab Bank and use it for the same purposes as the Wells Fargo bank account had been used. Charles Schwab Bank is familiar with the Receivership because some of the JV LLCs already maintain accounts there.

30. The Debtor believes that Charles Schwab Bank is a financially stable banking institution with FDIC insurance (up to an applicable limit, if any).

31. Since the intervention of the Receivership, the Debtor may not be current on all transactions undertaken by the Receiver that would be required to bring its Accounting System up to date.

32. The Accounting System, once populated with current data, and the Bank Account would comprise a working cash management system. Such system and procedures were utilized by the Debtor in the ordinary, usual, and essential business practices and are similar to those used by other private operating foundations. The cash management system facilitates cash forecasting and reporting, monitors collection and disbursement of funds, reduces administrative expenses by facilitating the movement of funds and the development of more timely and accurate balance and presentment information, and administers the Bank Account required to effect the collection, disbursement, and movement of cash. The cash management system benefits the Debtor in significant ways, including the ability to: (i) control foundation funds; (ii) ensure availability of funds when necessary; and (iii) reduce administrative expenses by facilitating the movement of funds and the development of more timely and accurate balance and presentment information.

33. The operation of the Debtor's business requires that the cash management system be restored to full operational status and continue during the pendency of this chapter 11 case. Requiring the Debtor to adopt a new, segmented cash management system at this early and critical stage of this case would be expensive, would create unnecessary administrative problems, and

would likely be much more disruptive than productive. Any such disruption could have an adverse impact upon the Debtor's ability to reorganize.

34. I understand that the U.S. Trustee Guidelines for a debtor-in-possession in order to supervise the administration of chapter 11 cases requires a chapter 11 debtor to, among other obligations: (a) close all existing bank accounts and open new debtor in possession bank accounts for which the signature cards shall indicate that the debtor is a "Chapter 11 Debtor-in-Possession"; (b) establish a new payroll account (not applicable here); and (c) maintain any funds in excess of the amount required for current operations in an interest-bearing account.

35. The Debtor seeks a waiver of the U.S. Trustee's requirements. I believe that the most efficient practice would be to replace the Bank Account as described above so as to avoid further disruption. I believe that the Bank Account is a critical component of an established cash management system that the Debtor needs to restore, maintain, and continue in order to ensure smooth collections and disbursements in the ordinary course. In order to avoid delays in payments to administrative creditors, to ensure as smooth a transition into chapter 11 as possible with minimal disruption, and to aid in the Debtor's effort to complete this case successfully and rapidly, I believe that the Debtor must be permitted to implement the Bank Account and, if necessary, open new and close existing accounts, wherever needed, whether or not such banks are designated depositories in the District of Delaware.

36. Of course, there is little use for the Bank Account unless and until the Debtor recovers its cash assets from the Receiver. Accordingly, the Debtor further requests that the Receiver be ordered to (i) immediately disclose to the Debtor the name and account number of any bank account in which she is holding the Debtor's cash assets ("Receiver's Bank"), and (ii) immediately provide to the Debtor a full accounting of the Debtor's cash assets since inception of the Receivership. In the meantime, the Debtor further requests that Receiver's Bank be restrained

from honoring any check, draft, wire, or electronic funds transfer presented, issued, or drawn on any such account holding Debtor's cash assets and on account of a prepetition claim unless: (i) authorized in an order of this Court; (ii) not otherwise prohibited by a "stop payment" request received from the Debtor; and (iii) supported by sufficient funds in the account in question.

37. To effectuate the foregoing, the Debtor requests that Receiver's Bank and Charles Schwab Bank be authorized and directed to rely on all representations from the Debtor as to which checks drawn on Debtor's funds should be honored or dishonored.

38. In addition, subject to a prohibition against honoring prepetition checks without specific authorization from this Court, the Debtor requests that the Bank Account, once established, be deemed to be a debtor-in-possession account and that its maintenance and continued use, in the same manner and with the same account numbers, if available, styles, and document forms as those employed during the prepetition/pre-Receivership period, be authorized. Changing correspondence and business forms would be expensive, unnecessary, and burdensome to the Debtor's estate and disruptive to the Debtor's business operations and would not confer any benefit upon those dealing with the Debtor. For these reasons, the Debtor requests that it be authorized to use existing business forms without being required to place the label "Debtor-in-Possession" on same.

39. If the relief requested in this Motion is granted, the Debtor will not pay, and Receiver's Bank will be directed not to pay, any debts incurred before the Petition Date, other than as authorized by this Court.

**B.   Motion for Entry of an Order Authorizing Retention and Payment of Professionals Utilized by the Debtor in the Ordinary Course of Business**

40. The Debtor customarily retains the services of various attorneys, accountants, and other professionals (the "Ordinary Course Professionals") in matters arising in the ordinary course of its business, unrelated to this chapter 11 case.

41. The work of the Ordinary Course Professionals, albeit ordinary course, is directly related to the preservation of the value of the Debtor's estate. Even though the amount of fees and expenses incurred by the Ordinary Course Professionals will likely represent only a small fraction of the value of its estate, the Debtor may not be able to continue to operate as a debtor-in-possession unless it has continued access to these professionals.

42. Given the necessity of these services, the delay associated with the application procedures applicable to bankruptcy professionals would hinder the Debtor's ongoing business operation. Further, some Ordinary Course Professionals may not be able to abide by such procedures, which would leave the Debtor looking for replacements. This would be costly to the Debtor insomuch as it would take these new professionals additional time to get acquainted with the specifics of the Debtor's business, and may leave the Debtor paying these new professionals higher rates for the same work.

43. By contrast, granting this motion will benefit the Debtor, its estate and creditors by providing cost-effective access to professionals with a past relationship with, and understanding of, the Debtor and its operations. Accordingly, since it is in the best interest of all of the parties and the creditors to avoid any disruption in the professional services rendered by the Ordinary Course Professionals in the day-to-day operations of the Debtor's business, this motion should be granted.

C.  **Motion for Entry of an Order Granting Additional Time within Which to File Schedules and Statements**

44. Pursuant to section 521(1) of the Bankruptcy Code, a debtor must file a schedule of all assets and liabilities, schedules of current income and expenditures and a statement of financial affairs (collectively, the "Schedules and Statements"). Bankruptcy Rule 1007(c) allows a debtor to file its Schedules and Statements within 14 days of a commencement date of a bankruptcy case. Thus the Debtor's Schedules and Statements are currently due on March 25, 2016.

45. By this Motion, the Debtor seeks entry of an order pursuant to Bankruptcy Rule 1007(c) and section 105(a) of the Bankruptcy Code extending the time within which it is required to file the Schedules and Statements.

46. The Receiver has possession, custody, and/or control over Debtor's business records and accounts and Debtor does not know what financial dispositions she may have made. Accordingly, even though Debtor has fewer than 200 creditors, Debtor submits that the 30-day automatic extension of time to file the Schedules and Statements under Bankruptcy Rule 1007(c) and Local Rule 1007-1(b) should be granted pursuant to the Court's equitable power embodied in Section 105(a).

47. The Debtor requests that such extension be without prejudice to its right to seek further extensions of this deadline from the Court, or to seek a waiver of the requirement for filing certain schedules.

## CONCLUSION

In conclusion, for the reasons stated herein and in each First Day Motion, I respectfully request, on behalf of the Debtor, that each First Day Motion be granted in its entirety, together with such other and further relief as the Court deems just and proper.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: March 22, 2016

_____
Name: Warren C. Havens
Title: President, Skybridge Spectrum Foundation