**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Skybridge Spectrum Foundation,[1] | ) | Case No. 16-10626 (CSS) |
| | ) | |
| Debtor. | ) | Obj. Deadline: April 29, 2016 at 4:00 p.m. |
| | ) | Hr'g Date: May 6, 2016 at 1:00 p.m. |
| | ) | |
| _____ | ) | |

**DEBTOR'S MOTION COMPELLING CUSTODIAN**
**TO TURN OVER PROPERTY OF DEBTOR'S ESTATE**

COMES NOW Skybridge Spectrum Foundation, debtor and debtor-in-possession ("Skybridge" or the "Debtor"), by and through its undersigned proposed counsel, and hereby moves this Honorable Court for entry of an order compelling custodian to turn over property of Debtor's estate (the "Turnover Motion") and in support of the Turnover Motion respectfully states as follows:

**NATURE OF ACTION**

1. This Turnover Motion is brought pursuant to Federal Rules of Bankruptcy Procedure 6002(a), 9013 and 9014; Local Rules of Bankruptcy Procedure 9006-1 and 9013-1; and Sections 105, 541, and 543(b)(1) of Title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code").

**PRELIMINARY STATEMENT**[2]

2. Skybridge is a non-profit created in 2006 for charitable, educational, and scientific purposes, including by providing programs, education, and research that promote

---

[1] The last four digits of the Debtor's federal tax identification number are 8487. The Debtor's mailing address is 2509 Stuart Street, Berkeley, CA 94705.

[2] This preliminary statement is intended as a general summary only. To the extent it contains inconsistencies with more detailed pleadings presented to this or other tribunals, the content of such other pleadings shall prevail. For additional background, the reader is referred to the *Declaration of Warren C. Havens in Support of the Debtor's Petition and First Day Pleadings* (D. I. 30) (the "Havens Declaration"), which is incorporated herein by reference.

public safety, environmental protection, and the preservation and sound use of scarce public resources.

3.      Skybridge is pursuing "public-private-nonprofit partnerships" where it collaborates with governmental agencies and private companies to utilize radio spectrum licenses obtained from the FCC for "smart" transportation and energy systems, environment monitoring and protection, agriculture efficiency, search and rescue, and other purposes.

4.      A main goal of its business plan is to implement nationwide, ubiquitous (including areas not served, or reliably served, by wireless carriers), highly accurate and precise radio-based positioning, navigation and timing applications benefitting the general public and national welfare.

5.      Skybridge has a two-part business plan. Part one, substantially accomplished in late 2014 - early 2015, involved acquired the appropriate FCC licenses and scrubbed them of improper encumbrances. Part two, involves establishing partnerships through which it can place its licenses in service and operation, thereby bringing a vision conceived by its principal, Warren Havens, over twenty years ago to fruition.

6.      Phase two was proceeding nicely when, in the fall of 2015, Skybridge and seven related non-debtor limited liability companies (the "JV LLCs" or the "Non-Debtor Entities") were placed into an improvidently granted receivership in a California. To understand the ramifications of that development, one must take a step back in time.

7.      Sixteen years ago, Havens and Arnold Leong entered into a loan agreement (first orally, then in writing) and thereafter entered into two related LLC operating agreements.

8.      Havens alleges that Leong fraudulently induced Havens to enter the loan and LLC Agreements, which Leong later repudiated by asserting the complete fiction that an "oral

partnership" had been agreed (despite determinative written evidence to the contrary). Leong's story contends that by this alleged oral partnership's terms, he co-governs all he chooses to ascribe to it -- essentially, all that Havens labored for during his entire adult life that touches in any way an FCC licensing matter. The terms of the written loan and LLC Agreements to the contrary do not appear to be an impediment to Leong's revisionist history. Nor do common sense business plausibility, or FCC legal doctrine.[3] The truth is, Leong has no valid member interests in the original two LLCs or any of the seven JV LLCs.

9. Skybridge is not one of the JV LLCs, and Leong has executed written confirmations to Havens, confirmed in sworn testimony, that Leong has no claims against Skybridge of the kind he has asserted in the California state court proceeding by which he obtained the Receivership over Skybridge and the JV LLCs.

10. And yet, Leong dragged Skybridge and the JV LLCs into well over a decade of vexatious and wasteful litigation before California Superior Court and AAA arbitration.

11. All the while, Havens kept his nose to the grindstone, carefully acquiring at bargain prices specific frequency FCC licenses that were passed over by other investors who could not see past their encumbered provenance. Having correctly assessed the invalidity of the purported encumbrances, Havens has spent 15 years before the FCC and various other tribunals methodically, persistently, tenaciously stripping the licenses clean of bogus encumbrances while simultaneously creating a network of companies (eight in all) to deploy the licenses through cutting edge methods of radio location, all to benefit the general public and national welfare.

---

[3]Leong alleges, for example, that after signing the LLC Agreements, with a small initial investment requirement in the range of $10,000, he could not be "diluted" as to the initial 49% profits and voting interest he began with, at any future time, no matter what capital was required to develop and operate the business, and that he could stop Havens as manager from taking any action authorized in the written LLC operating agreements, whether required under law or the needs of the business. Leong asserted near absolute control and interest. This is but a taste of the Leong illegality and fraud.

12.     Returning now to the near-present: 2015 marked the conclusion of the first stage of a marathon two-stage encumbrance-stripping hearing that had been pending before the FCC for four years. Havens had painstakingly, doggedly, sleuthed out improper conduct on the part of Skybridge's main competitor, Maritime Communications. Having passed that information on to the FCC, Havens and the Skybridge entities were invited to participate in the hearing alongside the Enforcement Bureau. As the hearing unfurled, Havens was unwilling to consent to various compromise proposals the Bureau was championing, as is often the modus operandi of overtaxed and under-resourced government enforcement agencies.

13.     In what is perhaps an instance of first impression before the FCC, the Bureau exercised its prosecutorial discretion to abdicate its enforcement rule, which by default fell to Havens and an attorney Havens had hired to represent (only) two of the seven JV LLCs (Environmentel, LLC and Verde Systems, LLC). Presiding administrative law judge Richard L. Sipple issued an order based on finding the law firm's motion for summary decision was unauthorized, and ascribed that transgression to the client LLCs and Havens in an order memorializing His Honor's frustration with Havens' tenacity as a pro se advocate during previous phases of the proceeding (the "Sipple Order").

14.     Nevertheless, Havens, acting for Skybridge and the JV LLCs, *prevailed* in stage one of the litigation, knocking 82% of Maritime's claim out cold.[4] The remaining 18% remains pending. The Sipple Order is replete with factual and legal infirmities and is subject to a pending motion for reconsideration and an appeal.

---

[4] And he had previously, for Skybridge and the JV LLCs, succeeded in years of contested adjudication before the FCC against Maritime that resulted in the full Commission issuing FCC 11-64, the hearing designation order that commenced the proceeding before Judge Sippel (the "HDO"), from which the Sipple Order ironically emerged. In FCC 11-64, the Commission made clear that it was the Havens pro se pleadings that were the seminal cause of the HDO, and the Commission designated Havens in the HDO as an individual party in the Sipple hearing against Maritime. Thus, Havens was properly, and for good cause, made a pro se party by the full Commission.

4

15. Apparently smelling blood in the water, and as a smokescreen for his own manifest violations of state and FCC law against Skybridge, the JV LLCs, and Havens, Leong pounced on the chance to flout the Sipple Order before the California Superior Court. Despite the fact that there was no evidence that the Skybridge entities were not paying their bills (which they were), or of the existence of uncollectible final judgments (of which there were none), or of under-secured debt (of which there was no secured debt at all), or of a lack of equity (of which there was millions, if not hundreds of millions), or of fraud, dishonesty, self-dealing, incompetence, or mismanagement (regarding all of which there was none), Judge Frank Roesch, cavalierly announcing that he had not read the briefs, and shooting from the hip without making any findings of fact, improvidently granted Leong's request to establish a receivership over all eight entities.

16. Months later, Judge Roesch stated that he had made a mistake in issuing the Receivership Order as drafted and tendered by Leong, and that the Receivership would have no part in the claims of Leong and the defenses and counterclaims of Havens, Skybridge, and the JV LLCs that were in arbitration. Judge Roesch ordered that Havens could proceed at arbitration, including on behalf of Skybridge and the JV LLCs, but improperly added that Havens must personally pay for the entities' defenses and claims.

17. The Receivership is bifurcated, or delimited, in this regard, where only Havens has the authority to continue to represent Skybridge and the JV LLCs in the arbitration. Judge Roesch made no findings of fact in the Leong actions before the Superior Court that resulted in the establishment of the partial Receivership, and as just noted, after the initial mistake, modified the Receivership Order to restore to Havens this key role.

18.     However, the Receiver and Leong then undertook actions to effectively moot the arbitration, and to place Haven's appeal of the Receivership Order at dire risk of equitable mootness, by setting up pretexts before the Superior Court in support of the "need" to sell off most of the Skybrige and JV LLC's licenses.

19.     Receiver Susan L. Uecker, for her part, immediately fired counsel for the Skybridge entities defending from false and fraudulent Leong claims, and fired most counsel to Skybridge and the JV LLCs in legal actions pending elsewhere involving third-parties (despite the fact that some counsel had more than 10 years of success in still-pending litigation), and before long had racked up an estimated $700,000 to $1 million in professional fees, including for her $600/hour accountants, that she had no means of paying.  She abandoned and reversed the principal strategic objectives that Skybridge and the JV LLCs had commenced jointly to maintain, improve, and use their respective FCC licenses for a common business plan and future developments.  She announced her intention to liquidate the companies' assets, with an apparent disregard of consequence.  She capitulated certain valuable litigation.  Facing wholesale waste of corporate assets, and not being able to ascertain the full extent of the damage Receiver had wreaked or was poised to inflict on Skybridge and its business plan, Skybridge filed its chapter 11 petition in order to preserve the going concern value of its estate and to enable it to reorganize so it can maximize benefit for all creditors.  Receiver's conduct has been atrocious.  Leaving her in control of Debtor's assets for another moment will only compound the miscarriages of justice Skybridge, and its legitimate creditors, have already endured.

20.     The pains to which Leong has subjected Skybridge -- a company in which he holds no membership interest whatsover -- are unconscionable

## JURISDICTION

21.     This Court has jurisdiction over this contested matter pursuant to 28 U.S.C. §§ 157 and 1334(b), and the *Amended Standing Order of Reference dated February 29, 2012 (Sleet, C.J.)*. Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. This contested matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (E).

## PARTIES

22.     Debtor is a section 501(c)(3) nonprofit, tax-exempt, nonstock Delaware corporation conducting business as a private operating foundation. Debtor's headquarters is located at 2509 Stuart Street, Berkeley, CA 94705. Debtor's president, director, and sole member is Warren C. Havens.

23.     Custodian Susan L. Uecker (the "Receiver") is a California state court appointed receiver over the Debtor and seven related non-debtor Delaware limited liability companies whose formation spanned 1999 through 2010.

24.     Arnold Leong, a retired dentist who obtained the Receivership Order, was, at one point, a minority interest holder in two of the Non-Debtor Entities.

## BACKGROUND

25.     On March 11, 2016 (the "Petition Date"), Debtor filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code. Debtor is operating its business as debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No committee or trustee has been appointed.

26.     On or about November 18, 2015, without issuing any factual findings, the Debtor and the Non-Debtor Entities were placed into an improvidently granted receivership pursuant to order of the State of California Superior Court for the County of Alameda in Case No. 2002-

070640, *Leong v. Havens* (the "Receivership"). Receiver Uecker is administering all eight entities as one combined venture.

27. Over the four months directly preceding the Petition Date, Receiver abandoned and reversed the principal strategic objectives that the Debtor and the Non-Debtor Entities had commenced jointly to maintain, improve, and use their respective FCC Licenses for a common business plan and future developments. As she has formally presented to the California Superior Court, Receiver seeks to liquidate the companies' assets, apparently without regard to consequences. These actions -- before the state court, the FCC, and the market -- have already seriously damaged Skybridge's business plan and have jeopardized *all* of the licenses. If left unchecked, the Receiver's actions would destroy the business plan -- highly successful to date[5] -- and waste the best use and highest value of all the licenses.

28. At the same time, Receiver has incurred enormous expenses.

29. Through chapter 11 reorganization, Debtor intends to preserve the going concern value of its estate, thereby maximizing the value of its assets for the benefit of all creditors. Debtor intends to resume its operations pursuant to its business plan, including by renewing and protecting the licenses, and by resuming management of its nationwide network of interrelated FCC licenses, including through implementing "public-private-nonprofit partnerships" in fulfillment of its public interest charter. Debtor will reorganize on its own if necessary, and owns the financial and license resources to do so. But it would prefer to resume cooperation with the Non-Debtor Entities, as together, their value skyrockets and their functionality is all the

---

[5] This includes, in the FCC hearing docket 11-71 under the FCC administrative judge Richard Sippel the single *substantive and final order* to date, FCC 14M-31, rel. October 9, 2014 (and the related admissions and stipulation of Maritime Communications) in which Havens and two Non-Debtor Entities, in support of the Debtor, succeeded in the full FCC Commission's goal of the hearing over 82% at its half way point. The effect of winning in the substantive order was to improve the Debtor's and the Non-Debtor Entities' assets by a 9-figure amount.

more compelling to potential private-sector counterparties, such as the wireless carriers or internet-based technology companies.

30. On March 24, 2016 (the "Emergency Hearing"), the Court entered an order (D.I. 18) granting-in-part (as to relief from stay) and denying-in-part (as to excuse from turnover) the *Emergency Motion of Receiver Susan L. Uecker for Relief From Stay and Excuse from Turnover to Allow Receiver to Renew Certain FCC Licenses* (D.I. 5). Consequently, the Receiver was temporarily permitted to retain control over Debtor's assets, pursuant to section 362(d) but not section 543, for the limited purpose of filing certain FCC license renewal and construction extension application by March 29, 2016, which has been accomplished.

## THE RECEIVERSHIP

31. During the four months leading up to the Petition Date, Havens made repeated inquiries of Receiver for any information regarding her conduct and operation of the pre-petition Debtor, or her future plans therefore, including the status of (i) previously contemplated joint venture business transactions Havens had negotiated, (ii) identification of any new or prospective business transactions, (iii) her decision-making relating to several important pieces of litigation pending in various courts around the country, (iv) any proposed or executed agreements respecting a disposition of its valuable FCC licenses, or (v) any other contemplated or executed transfers of its property. Receiver politely declined to respond.

32. The best Debtor could glean from reading the tea leaves was the fact that, although the California court had originally ordered that Receiver was bound to preserve the assets of the receivership estate, she pursued and obtained a modification permitting her to sell them and announced her intention to liquidate the assets of the receivership estate. This flies in the face of Third Circuit law providing that a receiver owes a fiduciary duty to the owners of the

property under her care, *Sovereign Bank v. Schwab*, 414 F.3d 45, 54 (3d Cir. 2005), and necessitated the bankruptcy filing lest Debtor's assets be squandered.

33. Post-Petition, by letter dated March 14, 2016 (and via email on numerous subsequent occasions) Debtor demanded, pursuant to sections 543(a) and (b) of the Bankruptcy Code, that Receiver immediately:

> … [C]ease and desist from making any disbursement from, or taking any action in the administration of, property of the Debtor, proceeds, product, offspring, rents, or profits, of such property, or property of the estate, in the possession, custody, or control of the Receiver, except such action as is necessary to preserve such property.
>
> … [D]eliver to the Debtor, care of [the office of Debtor's proposed undersigned counsel], any property of the Debtor, including, without limitation, all bank accounts and control of all licenses granted by the Federal Communications Commission, held by or transferred to the Receiver, or proceeds, product, offspring, rents, or profits of such property, that is in the Receiver's possession, custody, or control on the date hereof […, and]
>
> … [F]ile an accounting with the United States Bankruptcy Court for the District of Delaware of any property of the Debtor, or proceeds, product, offspring, rents, or profits of such property, that, at any time, came into the possession, custody, or control of the Receiver.

Demand Letter of March 14, 2016, admitted to record at Emergency Hearing as Exhibit A and incorporated herein by reference.

34. Despite repeated demands, Receiver has failed and refused to turn over to Debtor such property and control, and related information.[6] Receiver's failure and refusal to turn over

---

[6] Debtor's funds on hand at the outset of the Receivership in the amount of approximately $1,720,536.22 are its proportionate share of net revenue generated from certain licensing deals effectuated between 2013 and 2015 including: the 2013 Chesapeake Energy deals in Texas and Oklahoma (also involving non-debtors Environmentel, LLC and Verde Systems, LLC) and the 2015 Amtrak deal (also involving non-debtor Environmentel, LLC). Debtor holds the equitable and legal interest in these funds, which are property of the Debtor's estate pursuant to 11 U.S.C. § 541(b)(1).

On March 25, 2016, Receiver's counsel tendered to undersigned proposed counsel, apparently in lieu of a full accounting, a barebones statement of account reflecting the status of approximately $1.7 million of Debtor's cash assets. On April 12, 2016, an updated financial statement reflecting the status of approximately $1.4 million in cash was tendered.

Debtor's funds and return control of its other assets has caused and continues to cause serious harm to Debtor.[7]

## RELIEF REQUESTED; BASIS THEREFOR

35.     Upon the filing of a chapter 11 petition, the debtor becomes the debtor-in-possession. 11 U.S.C. § 1101(1).  The debtor-in-possession has all of the rights and powers and is obligated to perform all of the functions and duties of a chapter 11 trustee, including operating the debtor's business. 11 U.S.C. §§ 1107(a), 1108.  Indeed, that is the fundamental presumption underlying chapter 11.   *See, e.g., In re Princeton Square Associates, L.P.*, 201 B.R. 90, 95 (Bankr. S.D.N.Y. 1996).

36.     Leong and the Receiver would like to stand this presumption on its head by denying the Debtor the ability to operate at anywhere near full performance.  Nothing could be more central to a reorganization effort than restoring Debtor's access to and control over its assets and management information.  Leong and Receiver know this, of course.  Their strategy to choke off Debtor's supply lines while attacking from both flanks is all too transparent.  Indeed, if they can only deprive Debtor of its cash through a determination on their promised motion to dismiss the bankruptcy or alternatively to request abstention or alternatively to appoint a chapter 11 trustee or alternatively to transfer venue, all will have gone according to plan.

37.     Fortunately, the Bankruptcy Code is consistent regarding the primacy of a debtor-in-possession's right to operate in chapter 11 and reorganize.  Section 543(b) provides a follows:

A custodian[8] shall –

---

[7] Debtor reserves all rights against Receiver.

[8] Receiver is a custodian under the Bankruptcy Code. "The term 'custodian' means -- (A) receiver … of any of the property of the debtor, appointed in a case or proceeding not under this title…." 11 U.S.C. § 101(11).  *In re CCN Realty Corp.*, 19 B.R. 526, 528 (Bankr. S.D.N.Y. 1982).

> (1)  deliver to the trustee any property of the debtor held by or transferred to such custodian, or proceeds, product, offspring, rents, or profits of such property, that is in such custodian's possession, custody, or control on the date that such custodian acquires knowledge of the commencement of the case; and
>
> (2)  file an accounting of any property of the debtor, or proceeds, product, offspring, rents, or profits of such property, that, at any time, came into the possession, custody, or control of such custodian.

38. According to the Third Circuit, "[s]ection 543(b)(1) *specifies* that a custodian *shall* deliver to the trustee any property of the debtor held by or transferred to such custodian …." *Sovereign Bank v. Schwab*, 414 F.3d 45, 54 (3d Cir. 2005) (emphasis supplied); *see also In re Powers Aero Marine, Services, Inc.*, 42 B.R. 540, 543 (Bankr. S.D. Tex. 1984). Indeed, the turnover provisions of section 543 are mandatory. *In re C.W. Min. Co.*, 508 B.R. 746, 761 (Bankr. D. Ut. 2014). And because a hearing is not required prior to turnover, section 543(b)(1) is intended to be self-effectuating. *In re California Gardens Apartments, Ltd.*, 130 B.R. 509, 515-16 (1991). It therefore comes as no surprise that turnover of debtor's property is the general rule and excuse from compliance is the exception. *Id.*

39. The exception is found at section 543(d), which states:

> (d)  The bankruptcy court may, after notice and hearing, excuse compliance with subsection (a), (b) or (c) of this section, if the interests of creditors, and if the debtor is not insolvent, of equity security holders, would be better served by permitting a custodian to continue in possession, custody or control of such property.

40. This section is merely a recognition of a long-recognized doctrine of abstention now expressly codified in 11 U.S.C. § 305. A bankruptcy court may of course decline to entertain any controversy otherwise within its judicial competence if doing so would be in the interest of all parties concerned, although not necessarily in the interests of the debtor. *Matter of WPAS, Inc.*, 6 B.R. 40, 43 (Bankr. M.D. Fla. 1980).

41.     The party opposing turnover must demonstrate affirmatively by a preponderance of the evidence how creditors will be better served if a receiver is retained. *In re Bryant Manor, LLC*, 422 B.R. 278, 289 (Bankr. D. Kan. 2010); *In re Falconridge, LLC*, 2007 WL 3332769 at *6–7 (Bankr. N.D. Ill. 2007). But such proof Leong and Receiver cannot mount. There has been no suggestion that Debtor had failed, prior to institution of the Receivership, to pay its debts as they came due. There is no secured debt whatsoever, and there is plenty of equity. Leong's own valuation ascribed a value of between $500 million and north of $5 billion to the enterprise. Skybridge alone is worth, conservatively, $62 million. There has been no unreasonable compensation or purchases. There are no final judgments at risk of being uncollectable. The record is devoid of any reasonable allegation of fraud, dishonesty, self-dealing, incompetence, or gross mismanagement.

42.     All they can point to is the non-final Sipple Order, subject to a pending motion for reconsideration and an appeal, which they would have this Court believe stands for the proposition that because he ticked off the judge, Havens is somehow unfit to hold FCC licenses (despite the fact that through his entrepreneurial vision, creativity, spirit, and persistence he has tallied a 16-year track record of positive engagement with and demonstrated success before the FCC). The suggestion is preposterous.

43.     Havens, single-handedly, has already parlayed the value of the FCC licenses many hundreds-fold. This Court should summarily dismiss Leong's money-is-no-object illegitimate ploys and redress Receiver's complicity by validating the debtor-in-possession's right and desire to reinstate Havens to appropriately manage and operate the Debtor, as was the case prior to the Receivership. Indeed, Havens now faces the substantial task of assessing and unwinding the harm that Leong and the Receiver have inflicted on Debtor's business plan.

Frankly, there is no one else who can get the enterprise back on tract and recapture the value Leong and Receiver have jeopardized in the expedited timeframe required. Havens is not just the creditors' best hope, he is their only hope.

44. Recall that the Debtor's chartered mission is squarely devoted to serving the public interest. What more assurances could a non-profit debtor offer this Court than to be able to point to a solid record of past success creating from a pittance real value -- huge value -- combined with a carefully crafted business plan focused on promoting growth and benefiting the national welfare? Havens must be restored to executive control without further delay, supported with the full panoply of resources he has spent the last 16 years cultivating, before the damage becomes irreparable enterprise-wide and the real value is frittered away. This is the only option by which the interests of all creditors, as well as the general public and national welfare, will be best served.

45. The term "interests of creditors" is not defined in the Bankruptcy Code, and application of this test has been developed on a case-by-case basis. *In re Powers Aero Marine Service, Inc.*, 42 B.R. at 543 (Bankr. S.D. Tex. 1984). Bankruptcy courts have considered the following factors to determine whether a receiver should be excused from turning over a debtor's property under section 543(d)(1):

(1) The likelihood of reorganization;
(2) Whether funds held by the receiver are required for reorganization;
(3) Whether there were instances of mismanagement by the debtor;
(4) Whether turnover would be injurious to creditors;
(5) Whether the debtor will actually use the property for benefit of its creditors.

*In re Franklin*, 476 B.R. 545, 551 (Bankr. N.D. Ill. 2012) (collecting cases).

46. The burden is on Leong and/or Receiver as the parties opposing turnover to demonstrate affirmatively how creditors will be better served if Receiver remains in possession.

### A. The Likelihood of Reorganization

47. Without a doubt, Skybridge can reorganize on its own. It has the fiscal resources, appropriate licenses, industry contacts, academic contacts, government contacts, scientific prowess, entrepreneurial vision, and management know-how to implement, without any of the Non-Debtor Entities, a nationwide, ubiquitous, accurate and precise radio-based position, navigation, and timing system in accordance of its business plans. Would it prefer to have the cooperation of the Non-Debtor Entities? Yes, that would enhance its capability, and draw more interest from the wireless carriers.

### B. Whether Funds Held by the Receiver are Required for Reorganization

48. In a word, yes. Turnover of its corporate assets and management information is crucial. Once effectuated, depending on how much of the current $1.4 million in cash remains, it could sell, with the Court's approval, certain licenses that could quickly fetch millions of dollars, and the licenses contemplated would have no appreciable impact on Debtor's ability to implement its business plan: ubiquitous nationwide coverage. There is no doubt Skybridge can satisfy the debt of all its legitimate creditors in full.

### C. Whether There Were Instances of Mismanagement by the Debtor

49. In a word, no. Havens had successfully completed phase one of the business plan and was successfully implementing phase two when Leong put the Receivership in place. There was no appreciable legitimate debt.

50. As to the Sipple Order, Havens spent more than a decade pursuing Maritime's wrongdoing and successfully encouraging the Commission to issue the HDO that resulted in

clearing the encumbrances from a huge batch of licenses, only to see the Bureau representing the Respondent rather than the whistleblower. Havens became increasingly but understandably frustrated, and therefore even more tenacious in working to demonstrate Maritime's misconduct. Maritime, finally admitted that the licenses it had been attempting to shield for four years had never been placed into service and were invalid. It finally walked away from them.

51.  The Sipple Order is wrong on both the facts and the law on both grounds, is arbitrary and capricious and an abuse of discretion, and must be reversed. First, the record demonstrates that Judge Sipple gave permission for the motion to be filed; thus it was not unauthorized, and therefore was not frivolous or filed in bad faith. Second, of the numerous criticisms of the Havens' conduct recited in the Sipple Order, some are incorrect on the facts, inconsistent with the record, and/or taken out of context; the remainder of the criticized actions are within the bounds of conduct by a *pro se* party in hard-fought litigation, particularly here, where Havens found himself as the sole party pursuing the facts set out in the HDO, litigating not only against the Respondent Maritime, but also against the Bureau, which should have been carrying that burden. Debtor invites the court to review the record for itself, and hereby incorporates by reference the Supplemental Brief admitted into the record as Exhibit B at the Emergency Hearing.

52.  Possessing an entrepreneur's idiosyncrasies, being a tenacious advocate, and, yes, ruffling the occasional feather, even at the FCC, does not equate to mismanagement. Havens has been doing this work successfully, including before the FCC, for decades. Leong and Receiver's sky-is-falling hysteria is way overblown, and attributable to transparent ulterior motives.

**D.     Whether Turnover Would be Injurious to Creditors**

53.     Absolutely not.  Havens takes his fiduciary duties seriously, and has for years placed the interests of the companies he manages and their legitimate creditors before his own. Over the years he has personally contributed to Skybridge, without seeking in return any compensation, remuneration, or other pecuniary benefit whatsoever, sums well north of eight figures.

**E.     Whether the Debtor Will Actually Use the Property for Benefit of its Creditors**

54.     Of course and without a doubt.

<div align="center">~~~~~~~~~~~~~~</div>

55.     The property owned by the Debtor is of significant value and benefit to Debtor's bankruptcy estate and its creditors, and depriving Debtor of its cash is patently inequitable given the forthcoming challenge Leong has promised to bring.  Leong would have Debtor fight with one hand tied behind its back.  This Court should not countenance such sharp practice.

56.     Pursuant to Section 543(b) of the Bankruptcy Code, Debtor is entitled to an order of the Court directing Receiver to immediately turn over to Debtor all of its cash assets and other property, including the access codes that control its FCC licenses, and other information of Receiver's activities having any impact on Debtor, including a full accounting thereof.[9]

57.     It is all too apparent that despite his pretextual pot shots aimed at Havens, neither Leong nor Receiver can offer no persuasive evidence that the interests of creditors would be better served by permitting Receiver to continue to remain in possession, custody, or control of

---

[9] Rule 6002(a) provides as follows:
   (a) Accounting Required
   Any custodian required by the Code to deliver property in the custodian's possession or control to the trustee shall promptly file and transmit to the United States trustee a report and account with respect to the property of the estate and the administration thereof.

Debtor's property pursuant to section 543(d) of the Bankruptcy Code, even to a further limited extent. Rather, the Court should put a decisive end to the ploy to deprive Debtor of the resources it needs to prepare its defense to the promised motion to dismiss-abstain-appoint trustee-transfer venue.

58.     Leong and Receiver have the burden of proof, and they will be unable to carry it. *In re R&G Properties, Inc.*, 2008 WL 4966774 * 7 (Bankr. D. Vt. 2008); 5 COLLIER ON BANKRUPTCY §543.05 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.) ("Turnover is favored because 'a substantial weight is added to the debtor's burden of attempting to reorganize and to promulgate an acceptable plan of reorganization if debtor cannot have access to all of its assets during initial breathing spell.'"). Accordingly, the Court should deny any request to excuse Receiver's compliance with the turnover requirements of section 543(b) of the Bankruptcy Code, and the Court should order Receiver immediately to turn over all of Debtor's property to Debtor, including its cash assets, the access codes for its licenses, and its management information, and to provide a full accounting.

## **CONCLUSION**

**WHEREFORE,** Debtor respectfully requests this Honorable Court enter an order substantially in conformity with the proposed form of order attached hereto as Exhibit A, (i) granting the Turnover Motion and (ii) granting to Debtor such other and further relief as the Court deems just and proper.

Date:  April 15, 2016
       Wilmington, DE                         **SULLIVAN · HAZELTINE · ALLINSON LLC**

                                                   */s/* E.E. Allinson III
                                      Elihu E. Allinson III (No. 3476)
                                      901 North Market Street, Suite 1300
                                      Wilmington, DE 19801
                                      Tel: (302) 428-8191
                                      Fax: (302) 428-8195