## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Skybridge Spectrum Foundation,[1] | ) | Case No. 16-10626 (CSS) |
| | ) | |
| Debtor. | ) | Obj. Deadline: April 29, 2016 at 4:00 p.m. |
| | ) | Hr'g Date: May 6, 2016 at 1:00 p.m. |
| | ) | |
| | ) | |

### REPLY IN SUPPORT OF DEBTOR'S MOTION COMPELLING
### CUSTODIAN TO TURN OVER PROPERTY OF DEBTOR'S ESTATE

COMES NOW Skybridge Spectrum Foundation, debtor and debtor-in-possession ("Skybridge" or the "Debtor"), by and through its undersigned proposed counsel, and hereby submits it reply (the "Turnover Reply") in support of its motion for order compelling custodian to turn over property of Debtor's estate (the "Turnover Motion") and in support of the Turnover Reply and in opposition to Receiver's objection thereto (the "Turnover Objection"), respectfully states as follows:

### PRELIMINARY STATEMENT

1.      Think for a moment about Leong's *outlandish* claim:   That 18 years ago, Havens orally agreed, despite numerous subsequent written agreements to the contrary (containing integration clauses, no less), to grant Leong a perpetual, non-dilutable 50% partnership interest and ownership stake -- along with veto control rights -- in all FCC license-related business Havens would create and carry out for the remainder of his lifetime.  That Havens would have to do all the work in this "partnership," but that only he (Havens) could be diluted in the process. And that Havens re-extended this oral partnership offer again and again over the intervening

---

[1] The last four digits of the Debtor's federal tax identification number are 8487.  The Debtor's mailing address is 2509 Stuart Street, Berkeley, CA 94705.

years after each time Leong signed an LLC agreement (1999, 2000, and 2001) or disclaimer in connection with a sale of licenses (2004, 2005, and 2006).

2.      Because Leong knows his claim is a ruse, he is pressing Receiver to liquidate the Debtor and the JV LLCs in a 9-figure plus range so he can take the money and run.

3.      Receiver has apparently bought into this ruse, because she is liquidating the Receivership assets, where there is only a small amount of conceivably legitimate debt. See, Turnover Obj. at ¶¶4, 23, 64. Her allegation of being a "conservator-like" equity receivership, *id.*, at ¶23, is therefore false.

4.      Having racked up a *$1.2 million* bill for professional fees so far, and having terminated all of Debtor's technical and business R&D activities that supported license extensions, renewals, and public services, she has painted herself into a corner where she admittedly cannot pay her bills and where she *must* now liquidate the licenses because there is no longer any development activity occurring behind them (which means she will be unable to get licenses with a construction requirement renewed or extended).[2] As to those Skybridge licenses up for extension in fall 2016, the FCC, under a well-established rule, will not grant an extension for the purpose of re-sale in any event. In addition, she has not submitted any substantive filing to support the AMTS and Low-Band license applications for renewals and extensions. Thus, she is set to work a massive forfeiture. Her actions are a pretext. Moreover, Receiver has informed the market of the bind she is in, with only a fire sale option available, thereby pushing down the value of the licenses she intends to sell.

5.      Receiver acknowledges the success of "Phase One" of Debtor's business plan, but conveniently ignores that this success explains why Debtor has a compelling case for license

---

[2] Skybridge believes it holds the construction requirement for *all* the licenses at renewal, except the 40 MHz Range Low-Band Paging licenses. Receiver apparently does not believe any of the licenses have been relieved of their construction requirements.

renewals and extensions, and prompt construction and service, in Phase Two of its business plan. It also explains why Debtor was solvent -- because the licenses were cleared of encumbrances, and were highly viable and valuable -- when the Receivership commenced and could easily remain solvent and operational. The clearance of encumbrances was achieved under a year to a year and a half prior to commencement of the Receivership, therefore, depending on the class of Debtor's licenses, almost all of the FCC 5- to 10-year initial construction period for unencumbered remained. This is a compelling reason, among others, for FCC to grant extensions and renewals. Moreover, Debtor had no appreciable debt other than disputed claims.

6.     Receiver has apparently set about the task of settling disputed claims against Skybridge at full demand (or artificially inflated amounts) and capitulating sound claims of the Debtor in an effort to rewrite Debtor's legitimate financial history and status, and to curry favor among third-parties against former management by Havens and to support Leong's claims by which he obtained and maintains her Receivership.

7.     Moreover, Receiver's attempt to paint Havens as incompetent to operate the Debtor is nothing less than an outright smear campaign. Out of the hundreds of FCC orders issued to the Havens entities over decades, she focuses the Court on one or two, both on appeal, that do not undermine the success represented by the hundreds of final orders obtained in Phase One and Phase Two of Debtor's business plan. Neither Leong since commencing his complaint against Havens in 2002 based on "oral partnership" nor Receiver since the Receivership began has asked the FCC to determine in its exclusive jurisdiction the matters they present to the Court here, including whether the FCC should maintain Havens' established qualification to managed FCC licenses and licensees. Nor whether Leong's alleged co-control that he hid from the FCC for decades is permissible under FCC law. Nor whether the Receivership is any cure for their

3

allegations of improper actions on Havens' part before the FCC that they believe jeopardizes the licenses. Havens had existing briefs in the California court action that these claims are subject to exclusive FCC jurisdiction and preemption of alternative remedies in any other court or arbitration. Leong had every right over decades and Receiver may have rights to make their claims to the FCC. Having failed to do so, except by indirect suggestions, Havens has recently directly stated their claims to the FCC for proper determination under FCC jurisdiction and law.

8.      The Sippel Order is invalid and incorrect as demonstrated in the appeals by Debtor, Havens, and the LLCs. And thus poses no actual cloud on the licenses or Havens' qualifications. However, even when asked by the FCC Office of General Counsel for her position on the appeals, Receiver, backed by Leong, would not agree or disagree with the appeals but asked the FCC to stay and not rule on the Sippel Order and appeals because they suggest the Order creates a danger, which is a way of stating that the Order has merit and the appeals do not. Because the Receiver has control over the licensee-appellants, her and Leong's position undermines the defense of the licenses but with no explanation. That constitutes a breach by the Receiver of her core duty under the Receivership Order to the California court and the estate. They then propose liquidating the licenses as a remedy, but again with no explanation in FCC law for how that would cure any danger posed by the Sippel Order. It does not work. The sale remedy conflicts directly with Section 309(d) of the Communications Act which calls for the Commission to hold a hearing on license applications, including for license sales, if there is a material question of fact before the Commission concerning whether grant of the application is consistent with Commission rules and the public interest. Until the Sippel Order and appeals thereof are decided, the Order poses such a question. Accordingly, a stay of decision on the Sippel Order and appeals to allow a sale only to end up under section 309(d) with those matters

required to be decided upon, and Commission decisions on the applications for license sales, is a pretext.    Again, Leong needs sales to take the money and run, and his Receiver is accommodating.

9.    There is no meaningful dispute that given the protections of Chapter 11 and the turnover of its assets, Debtor can and will reorganize and efficaciously maximize the value of its assets as a going concern, thereby satisfying the claims of its legitimate creditors in full, maintain and continue to create economic value that the Code is designed to foster.    Indeed, while Receiver feels constrained to liquidate, Debtor enjoys a constitutional right to seek relief in federal court. See, U.S. CONST. art. I, sec. 8, cl. 4 ("The Congress shall have power to establish … uniform Laws on the subject of Bankruptcies throughout the United States").    Uniform nationwide bankruptcy laws were developed for the many of the purposes directly at issue in this case:

> (1) the avoidance of the evils of equity receiverships; (2) the correction of fee abuses in equity receiverships; (3) to avoid immediate liquidation with a view to rehabilitation; (4) to facilitate recapitalization; (5) to rearrange creditors' rights in the property of the debtor; (6) to administer the case expeditiously and get the debtor out of court, duly reorganized, in as short a time as possible; (7) to provide relief against a recalcitrant minority group of creditors; (8) to preserve the debtor's going concern value so that it would be available for the payment of creditors' claims; and (9) to effect an equitable distribution of the debtor's assets among its creditors in accordance with their relative priorities.

*In re Jeppson*, 66 B.R. 269, 279 (Bankr. D. Utah 1986) (referring to the Chandler Act).

10.    Only in bankruptcy can the debt be determined, prioritized, and resolved properly. However, in the Receivership, there is a lack of effective oversight and Receiver is improperly incurring large debt with her professional fees and by improper settlements with third parties. Receiver has refused to communication on substance with Havens who is the majority interest holder in all the estate entities.    Debtor is listing all potential creditors in its schedules so there

will be full transparency to the claims adjudication process that is a hallmark of bankruptcy procedure. By contrast, Receiver's "supposed" claims process is not complete, transparent or effective. For example, Receiver has not even provided to Havens and former employees and contracts a claim form and description of the process, including as to priorities. The interests of creditors would be better served if Receiver were compelled to turn over Debtor's assets,[3] which she should be ordered to do without further delay, so the Debtor can get about the business at hand - reorganizing as a going concern.

## ARGUMENT

### I.    The Purported "Facts" and Innuendo Contained in Receiver's Turnover Objection are Largely Incomplete and Incorrect

---

[3] Receiver's pleadings reveal that even to this day, with the assistance of FCC specialist counsel, a spectrum broker, and a spectrum valuation expert, *id.,* at n.16, she still cannot correctly articulate the value relationship between licenses held by the Debtor and those held by the Non-Debtor Entities. She writes: "Many of Debtor's Licenses were created out of licenses of the other entities by "disaggregating" portions of spectrum from those licenses. Often, the disaggregation resulted in one entity owning spectrum for uplinking or transmitting signals, and another for downlinking or receiving signals. Both are generally needed for wireless communications. Having only one is far less valuable than having both, and yet Havens' decision to have Skybridge file bankruptcy has resulted in a split that reduces the value of both Debtor's Licenses and the Receivership Entities' Licenses." *Id.*, at ¶10.

This is simply wrong. Havens has heard the above from Receiver. She is talking only about the MAS licenses, which themselves are roughly one half of 1% of the total spectrum in all the licenses. Second, the FCC granted the LLC's argument that Debtor and Intelligent Transportation and Wireless Monitoring, LLC ("ITL") can properly and best be used to augment the LMS licenses. The FCC was entirely aware of the disaggregation and that Debtor and ITL had respective portions of the original licenses. The FCC accepted the argument that all of these licenses are best used with the much wider LMS licenses which are hundreds of times wider in capacity. The FCC determination is contrary to Receiver's assertion. In addition, the FCC did grant the disaggregation applications, resulting in distinct licenses for Debtor and ITL. The FCC does not create licenses that are not practical and viable and would not have granted disaggregation if the Receiver's alleged pairing was required for practical or legal reasons.

Further, Receiver shows by this assertion that she hasn't listened to the core elements of Debtor's and the LLC's two-phase business plan, which includes spectrum that the precise, location, and timing applications (the highest and best use) and the means to obtain compelling public-private partnerships and have the spectrum in use in smartphone and any other radio device involves one-way broadcast radio signaling. The MAS licenses, and all of the other licenses of these entities, were chosen in large part because they are among the very best spectrum ranges and high-power radio services for this core broadcast purpose. This one item alone shows the Receiver has little understanding of FCC licenses, radio technologies, and the successful business plan which resulted in the Receivership entities and license the Receiver took over. Without this understanding of what she holds, she cannot negotiate effectively in the market because no one lacking knowledge can effectively market an unknown product, even if liquidation were proper (which it is not). Finally, this further shows the Receiver would not follow the court's instructions to obtain information from Havens on the property of the Receivership and how to continue to manage it effectively.

11. Receiver states and Havens responds that Havens has:

    (a) failed to comply with construction or service deadlines with respect to many of the Licenses, resulting in cancellation of valuable spectrum licenses by the FCC; *Id.*, at ¶6.

12. Incorrect. Less than 1% of the spectrum and less than 1/10th of 1% of the value is involved in cancelled or terminated licenses, but that is on appeal, and the vast majority of that spectrum was Havens' personal spectrum donated to Skybridge, and the FCC decision was contradicted the clear language of the rule and the face of the subject licenses, and has been superseded by more recent FCC precedent.

    (b) failed to file Debtor's tax returns or pay taxes for certain Receivership Entities; *Id.*

13. Some returns were late, but for good cause, and not late under the relevant IRS three-year rule, which the IRS determined last week in a formal letter. In addition, no Receivership entity pays taxes because the Debtor is a non-profit tax-exempt entity and the LLCs are pass-through non-taxed entities.

    (c) failed to properly maintain the Receivership Entities' and the Debtor's books and records; *Id.*

14. False. It is the Receiver that has failed to even ask for the Receivership entities' books and records apart from certain accounting back up files and particular documents for an IRS audit of one entity in one year. In addition, the Receiver ignores Havens' repeated explanation that she is hold the Arbitration trial binders with the detailed books and records of the Receivership entities, in which Leong alleges interest in the arbitration, down the most detailed level in the expanded, full version of the general ledgers.

> (d) engaged in highly questionable allocations of costs and assets between the Debtor and the other Receivership Entities; *Id.*

15.    False.  See (c) above.  The Receiver is engaging in pretext of not having the information that shows proper allocations.  In addition, the Receiver has refused the offers of Havens and the accountant for the Receivership entities for the account to give explanations of the books and records, because she will not pay for any time of this professional accountant.  She appears determined to create pretext.

> (e) distributed $1.25 million of cash to himself as "deferred salary" on the eve of a hearing in Alameda Superior Court on a motion to impose a receivership, based on his own formula; and *Id.* (footnote omitted)

16.    False.  The books and records show that this was legitimate owed salary, paid properly after closing a sale of spectrum to Amtrak at which time the Receivership entities that owed the salary had ample cash to pay the salary, all other legitimate obligations, and with ample remaining cash for their business plan operations.  The payment was timed on that basis and not in relation to the court action.  Payment was also not based upon Havens' own formula, but on a professionally-determined salary for Havens' services in the subject industry, location of the country, and nature of the business.  In addition, the salary amount was under the mid-range of the professionally-determined salary in all years.

> (f) lost hundreds of FCC licenses due to his failure to comply with FCC deadlines. *Id.*

17.    This appears to be the same allegation as (a).

18.    Elsewhere she states:

> Havens has lost credibility with the FCC. *Id.,* at ¶11.

19.     This is naïve and a pretext.  FCC records clearly show that any significant wireless company, and control group of such companies, regularly challenge FCC decisions before the FCC and in court, including the most "credible" as commonly considered (e.g., AT&T and Verizon).  In fact, the largest FCC fines and sanctions are against these commonly considered "most credible" companies.  Congress determined in the 1996 Telecom Reform Act, which restructured the Communications Act, that the FCC must broadly deregulate the burgeoning highly successful wireless industry, because a small group of regulators in Washington could not very well understand and keep up with the wireless industry.

20.     Thus, Congress implemented reforms to encourage more vigorous competition among existing and new wireless industry participants.  This resulted in increased contests at the FCC by competitors and new entrants like the Havens-managed companies.  The FCC must decide those contests, and Congress expects competitors to use their full rights to seek reconsideration as part of the robust competition.

21.     Whereas some FCC staff persons may improperly attribute robust petitioning as irritating or a cause for lack of credibility, it is actually, under the Telecom Reform Act, what Congress expected.  For example, in the period in which Judge Sippel criticized Havens from sometime in 2012 to some point in 2014, that is the very perild in which the Havens-managed entities succeeded before the Wireless Bureau and the full Commission in the clearance of encumbrances to virtually all of their licenses.  Those successes show credibility, not loss of credibility.  For example, in Havens' initial declaration in support of the petition, Appendix C lists some of those major decisions.

That the FCC has previously rejected Havens' arguments that

> Skybridge should be given more favorable treatment based on its status
> as a non-profit entity, its intention to use its Licenses for "public service"
> or as part of a "public/private" partnership. *Id.,* at n.4.

22.    False.    In FCC rules and precedents, the FCC gives relief to non-profit organizations that have tax-exemption under IRC section 501(c)(3). The FCC has not rejected any substantial request by Skybridge or as to its non-profit pursuit of public benefit wireless, including by public-private partnerships, because Skybridge has not yet presented any such substantial request upon a decision has been made. As indicated in Havens' three declarations, Skybridge and the JV LLCs were in the early stages of Phase Two of the business plan when the Receivership commenced. Skybridge had planned as part of Phase Two to submit various arguments to obtain benefits for its pursuit of non-profit, public interest wireless. This has in part been presented in currently pending AMTS and Low-Band license applications, regarding which the Receiver has shown no substantial support, which jeopardizes those applications. Further, the FCC did grant to Skybridge (and at the same time to Telesaurus Holdings GB, LLC) the first-ever granted status as "private commons". Skybridge's granted request for private commons did include its showings of non-profit, public benefit wireless services, including to government agencies.

> [The Sippel Order] was the culmination of Havens' repeated abusive
> tactics at the FCC over the course of many years, for which he has been
> admonished and sanctioned on many occasions. *Id.,* at ¶25.

23.    False on the two component counts. First, by the Receiver making this charge in the public bankruptcy case, she is violating the Receivership Order by taking sides with Leong's position on the Sippel Order, which the California court her not to do. Further, she is jeopardizing the Skybridge license assets by implying that the Sippel Order correctly found Havens engaged in abusive and sanctionable actions. This is the opposite of a conservative,

protective, neutral receivership. She clearly has no compunction with endangering the licenses in order to bolster her attempt to back Leong's unlawful claims. In addition, Receiver does not even state what are the "so-called" many occasions. In any case, all of the major Phase One licensing decisions of the Debtor and the LLCs were successful before the Wireless Bureau and the full Commission, and none of those contain FCC expressions of alleged improper or sanctionable tactics or behavior.

> The Receiver has uncovered a variety of problems with Havens' management of Debtor and the other Receivership Entities. These include:
>
> • continuing failure to make timely filings of Debtor's tax returns, which have resulted in the revocation of Debtor's tax-exempt status; *Id.*, at ¶26.

24.    False. The Debtors' tax-exempt by error as the IRS recently formally stated, exactly as Havens explained to the Receiver when she first raised that the IRS sent her a letter of revocation. Instead of assisting the Debtor to maintain its exempt status, which any legitimate receiver would do, she took no action to assist, thus, as part of Debtor's bankruptcy, Debtor took on that task to show the IRS its error, upon which the IRS promptly corrected its error and reinstated the exempt status without gap. As to alleged late returns, this is addressed above. In addition, by Receiver's refusal to turn over to the Debtor its financial books and records during the Receivership period, Receiver has prevented Debtor from preparing its 2015 federal and state tax returns for filing by the May 15, 2016 deadline.

> • the filing of tax returns for Receivership Entities without paying the taxes due; *id.*

25.    False. As explained above, Skybridge is a non-profit and pays no taxes, and the LLCs as pass-through entities pay no taxes. Receiver has hired an alleged highly-experienced accountancy firm with charges up to $600 per hour, and has highly-experienced legal counsel. It

is inexplicable how Receiver, with this level of counsel, could make sure clearly incorrect assertions.

> • seemingly random allocations of costs to the various entities, including the apparent allocation of no costs to Debtor for a lucrative 2015 spectrum sale to Amtrak; *id.*

26.    False.  As noted above, it's the Receiver's own failures that, if not an outright pretext, that can explain this charge, because Receiver has the detailed accounting and allocations in the noted trial binders, which Havens pointed out to Receiver a number of times, and Receiver refused to engage the accountant for the Debtor and the LLCs to explain any allocation or other matter she may not understand.  The Debtor took on in the Amtrak sale contracts to fulfill its commitment, which is a cost, to the LLCs involved in that sale, to meet the construction obligation for those LLCs in the Amtrak corridor.  Skybridge meeting its construction obligations clearly inures to the benefit of the LLCs in various way under FCC rules and policies.  The value of this assumed and performed obligation is far greater, by multiples, than the total costs of the transaction.

27.    In addition, there were very modest costs for the entire transaction apart from high-level input by legal counsel, and support by Atlis staff (mostly to help prepare the FCC applications).  The major cost was Havens' time, which as he explained in his declarations, he does not charge to the Debtor, including this Amtrak transaction.

> • the distribution to himself of $1.25 million in "deferred salary" in May 2015 while an *ex parte* hearing seeking the receivership was pending in California state court; *id.*

28.    See above.

> • engaging in serial litigation against numerous parties while often changing counsel and leaving many counsel unpaid; *id.* and

29.    This is a mischaracterization.  The so-called serial litigation, which Receiver does not seem able to identify, was highly successful in clearing the license encumbrances in Phase One of the business plan.  For example, it resulted in clearance of virtually all of the third party claims to hold large portions of the Debtor's and the LLC's AMTS licenses nationwide, improving their value by a 9-figure sum for a modest 7-figure cost in legal fees.

30.    In addition, these entities also succeeded in a 10-year proceeding, with counsel at various stages, to win the FCC rule-change proceeding that entirely encumbered and hung-up use of the entities' 900 MHz LMS licenses and associated MAS licenses nationwide.  This also resulted in an improvement in the 9-figure range, again for a relatively nominal cost in legal counsel.

31.    What Receiver appears to mean here is to repeat Leong's claim in the decade-long arbitration, which the California court ordered Receiver to refrain from, that the change of counsel for Havens and the LLCs involved was too frequent and somehow improper.  The simple reason that the Leong claim is invalid is because the arbitrator never found that any such change was for improper purposes or caused any prejudice to Leong.  The LLCs and Havens were engaged in major nationwide wireless with many actual or potential opponents or competitors. This led to a number of law firms finding conflicts during the course of the arbitration requiring withdrawal because they could not obtain conflict waivers from their other, larger clients.  In other cases, attorneys were not able to continue, divorce (which disabled their practices), disabling injury and disease, an attorney taking a judicial clerkship, attorneys from the East Coast unable to get their West Coast affiliates engaged, and like reasons.  Havens did change several attorneys out of choice to obtain more effective counsel which is not uncommon in a ten-year proceeding.

• the loss of hundreds of FCC licenses by failing to meet construction and in-service requirements necessary to maintain these licenses, while continuing to pursue arguments for favorable regulatory treatment by the FCC that have previously been rejected. *id.*

32.    Refuted above.

The structure of the disaggregation divides each license so that the uplink and downlink portions were split between Skybridge and another Receivership Entity. If control of Skybridge is separated from the other entities, the control of the complimentary pieces are also separated. An uplink piece is far less useful alone than when paired with a downlink piece. Separating them vastly reduces their value and their usefulness. *Id.*, at n.7.

33.    See n.3.

The Receiver notes that Havens was paid $1.25 million in "deferred salary" by one of the other Receivership Entities in late May 2015. That payment would be presumed to be an insider preference if that entity had filed bankruptcy in March 2016 along with Skybridge. *Id.*, at ¶32 (footnote omitted).

34.    Regarding the payment, see above.  Regarding the alleged preference, the subject LLCs were not insolvent at the time of the Receivership, although the Receiver seems to be attempting to artificially create financial burdens on Debtor and the LLCs by her improper settlement of improper claims against the entities and concession of viable claims held by the entities.

Havens reasons that spectrum donations to Skybridge by the other entities provide those entities with value and justifies Skybridge not being apportioned any share of common expenses. *Id.*, at ¶34 (footnote omitted).

35.    Partly correct, but fails to fully explain the relevant factors, including the magnitude of value provided by Skybridge to the LLCs, and entirely fails to admit what has been shown to the Receiver.  Again, what the Receiver alleges here, as in most all of her opposition, is parroting the Leong claims in arbitration which she is prohibited from doing under the modified Receivership Order.  In addition, now that Receiver has abandon her restraint thereunder, she avoids the fact that Leong approved in writing these donations to Skybridge for two specific

highly-valuable benefits:  (i) spectrum donations resulted in tax deductions that flowed through the donor LLC's including Leong based upon the highly-appreciated value of the donated spectrum.  This would provide tax savings of far more than the total cash invested by the members, including Leong, thereby providing a major return on investment by itself, in addition to the following major value, and (ii) by the spectrum donations, as clearly provided in FCC rules, Skybridge would accept construction obligations and deadlines of the donor LLCs, thereby relieving them of the need to raise a 9-figure sum by the construction deadlines to meet this requirement.  Relief from that obligation increased the value of non-assigned spectrum more than the value of the minor portion of the licenses that was assigned.

36.    To be clear, the LLCs have shown, along with the Debtor, a compelling nationwide business plan for all of the spectrum to be put into high-value construction and operation with advanced technologies soon after clearance of encumbrances in Phase One, which was efficiently and almost fully achieved.  The ability of the LLCs and Skybridge to achieve Phase Two, to construct to operate, was greatly improved by the benefits noted above.

37.    In addition, as Havens explained in detail in Appendices A and A2 to his first declaration, Skybridge as a non-profit can partner with government entities to use their wireless antenna sites and infrastructure because Skybridge will provide significant help to these government agencies to meet their wireless goals, including for precision location and timing to augment GPS.  On the other hand, commercial for-profit companies, including the LLCs, cannot partner with government agencies in that way due to government restriction that require complex federal and state acquisition procedures, including RFP procedures.

Turnover … will endanger the Licenses [because:]

15

Prior FCC decisions … described below, indicate that Havens has been repeatedly sanctioned by the FCC and has had many licenses extinguished in the past. *Id.*, at ¶37.

38.    Refuted above.

Licenses will be frozen if the FCC issues a hearing designation order ("HDO") against Havens, as suggested by FCC Administrative Law Judge Richard L. Sippel in the Sippel Order.  If the HDO is issued, the Commission will undertake a hearing process that could last years to investigate Havens' character qualifications. During that time, under the FCC's *Jefferson Radio* doctrine, the FCC will not allow transfers of the Debtor's or any of the other Receivership Entities' Licenses, except in narrow circumstances. If the FCC ultimately finds that Havens does not meet the character qualifications for holding FCC licenses, all of the Licenses will be revoked.  *Id.*, at ¶38.

39.    Incorrect and misleading.  First, as indicated above, the Sippel Order is invalid and incorrect as shown in the appeals by Debtor, Havens, and the LLCs.  Debtor and Havens are confident that the appeals will be granted, including since the Sippel Order is based upon mistakes shown to Judge Sippel in a Petition for Reconsideration by the Chadbourne law firm, defending its own work, because the only charges in the Sippel Order that could support a referral on alleged "character qualifications" were actions described by Judge Sippel by the Chadbourne attorney Stenger, not Havens.  Stenger's actions were not improper, but even if they were, the judge could not to Havens any fault of Stenger.

40.    The so-called "Jefferson Radio Doctrine," like many such doctrines, is not codified and has no clear definition.  It does not automatically cause any "freeze" or other restriction.  Any HDO is based upon particular facts and circumstances and may or may not involve restrictions.  Receiver's claim ignores the fact that Debtor was not even a participant in the hearing, and under due process and the only rule the judge cited for the character qualification question he referred to the commission, only participants in the hearing could be

16

subject to any sanction including such a posed question. Again, it is incredulous that Receiver who poses as protector of Debtor cannot even make this argument to the Commission that Debtor must be excused from this posed question. It is apparent that Receiver refuses to protect Debtor because she is determined to create and maintain pretext to benefit Leong and sustain her improper Receivership. If she were to succeed in supporting Debtor' appeal of the Sippel Order, she would end up terminating the basis of her receivership. She appears to understand this conflict of interest and breaches her fiduciary duties and obligations under the Receivership Order to protect the licenses and the entities as fully as possible, regardless of whether that is contrary to Leong's claims to use the Sippel Order as a pretext, as he did, to obtain the Receivership.

41.    In addition, the above misstates the Sippel Order. It did not simply pose the question on Havens' qualifications, but also the Receivership entities. The FCC has never found that the Receivership entities and not distinct entities with separate assets and interests, including in the Sippel Hearing. In fact, adversaries Maritime and its affiliate TSI, in an earlier proceeding argued that various Havens' managed entities should be deemed the same. In a formal FCC ruling, the FCC denied the allegations based on evidence the Havens' entities presented.

42.    Further, Receiver entirely avoids the real danger resulting from the Receivership, which is the Leong alleged co-control "oral partnership". That issue is now before the Commission. It was first placed before the Commission by Leong's attorney in 2015 announcing the Leong attempt and expectation to obtain the Receivership. Leong's attorney included Leong's pleadings in the California claim, including his core claim of alleged co-control. After obtaining the Receivership, and the Receiver appearing to seek control over the entities' licenses, and submitting her "stay and sell" proposal, this question of the cause of the

Receivership and its beneficiary, Leong, became an active question. The subject of the Sippel Hearing, an adversary of the Debtor and the LLCs, Maritime, has proposed to the Commission that it should issue an HDO regarding Leong's alleged co-control that he has hidden from the FCC for 18 years (which at all times Havens has fully denied and which written agreements and disclaimers signed by Leong show as false). Receiver had taken no action to defend the Debtor and the LLCs from this serious risk posed by Leong's false claim. Again, if Receiver were to properly protect Debtor from this false claim, she would undercut the basis of her Receivership.

43.    Additionally, post-petition, Debtor submitted a petition to the FCC demonstrating with clear evidence that Receiver violated Commission law by first taking control over all the licenses and associated cash needed for "practical control" and thereafter applied for FCC approval of taking control. In addition to that violation, the application did not even seek transfer of control from the former controlling interest, i.e., Havens, but instead sought transfer of control from the entities themselves, which did not have control.

44.    Receiver also failed to tell the FCC about the modified Receivership Order which restored to Havens control over Debtor and the LLCs for all purposes relating to the Leong claim, including the noted "oral partnership" co-control, and to continue with the entities' counterclaims against Leong, including that he fraudulently induced Havens into the written agreements regarding two LLCs (and there were no other agreements with Leong granting him an interest in the Debtor or any other LLC). In other words, there is a type of control reinstated to Havens under the modified Receivership Order but it still maintains a "gag order" from Havens communicating with the FCC regarding the Receivership entities. Therefore it was Receiver's duty to inform the FCC of the modified Receivership Order because the Commission would have to decide how to rule upon that unusual type of split control. Receiver never did that

and there is specific FCC law requiring that a controlling person present such major change. Debtor alleges that these violations by Receiver of fundamental FCC law are sanctionable and that sanctions should be imposed on Receiver but not the entities. FCC rules provide that violations of this sort, especially taking control before securing FCC authorization, can result in fines beginning at many thousands of dollars per event. There are over 5000 licenses involved and various such events.

45.    Finally, if Leong's claim in Debtor's licenses were sustained, it means that they were unlawfully disaggregated and assigned to Skybridge under false representations to the FCC. That could result in FCC vacating those assignments to Skybridge and imposing various fines and sanctions. If the assignments were reversed, it would mean that Skybridge did not relieve the donor LLCs of the construction requirement of the assigned licenses, the deadline for which has passed for most of them. That would result in the loss of those licenses. The net effect of the Leong claim, if sustained, would be that Debtor holds no licenses, and the LLCs would lose most if not all of theirs, based on unauthorized assignments.

46.    To be clear, the underlying Leong claim that he had and still has a co-control oral partnership and that he did not approve the spectrum donations are both clearly demonstrably false. But because he has used those claims to get the Receivership over Debtor, and based on that Receiver and Leong challenge this bankruptcy, this is posing further substantial risk to the Debtor and the LLCs of significant hearings and other proceedings at the FCC. As partly indicated in Havens First and Second Supplement Declarations, Havens won the Sippel Hearing. All of the substantive orders in the Hearing on the actual case against Maritime were issued in favor of the pleadings submitted by Havens, including denial of repeated summary decision - settlement motions, ultimately resulting in Maritime admitting that it had some two years earlier

abandoned 82% of its license stations, which then automatically terminated at that date, yet Maritime dragged Judge Sippel and the Enforcement Bureau and Havens, and the several active LLCs through several years of hearings based on Maritime's fraudulent assertions that those stations were valid. At the same time, Havens also prevailed individually and for Debtor and the LLCs before the full Commission in defeating Maritime's attempt to escape the second phase of the hearing regarding its geographic licenses (for which two of the LLCs were the lawful high bidders) in Maritime's extraordinary attempt for relief under the so-called "Second Thursday" Doctrine.

47.    In previous times, the FCC awarded preferences to parties who prevailed to demonstrate to the Commission false claims for licenses. While those rule-based preferences have been abandoned, nevertheless, parties who succeed as did Havens and the participating entities he managed still gain good will and credit before the FCC for achieving Commission fundamental goals to curb licensing fraud and abuse. Congress and the FCC have stated that one purpose of the petition rights that commence in challenges under Section 309(d) of the Communications Act is to engage parties with legal standing and interest to undertake proper challenges to help the FCC achieve these goals. By the noted success in the Sippel Havens and the participating LLCs cleared off a large stack of contested licensing matters that had backed up in the Wireless Bureau for over a decade (those 82% of Maritime's licensed stations).

> Second, even if an HDO is not issued, many of the Licenses face
> construction or service deadlines or renewal deadlines that require the
> FCC to exercise discretion in order to extend deadlines. This is anything
> but a sure thing. If extensions are refused (which has happened in the
> past), the Licenses subject to extension requests will terminate. *Id.*, at ¶39.

48.    Refuted above. In addition, again, Receiver is utterly speculating that only she has ability to determine the nature of the licenses, their history, the probability they can be

renewed and extended, and that the best solution is a liquidation. However, Receiver does not show understanding of even the most fundamental nature of these licenses, the entities' business plan, of the fact that they have only had 1 to 1.5 years of effective construction periods, and that Havens was active in all options to preserve and maximize value in the licenses, including by engaging major investment bankers, consultants, including a former wireless project manager of a major international corporation, and direct discussions with some of the best known wireless and technology companies in the U.S. and international markets for a range of options including, sale of selected portions of the three nationwide license bands to both raise major sums and secure that appreciated value, for partnerships to build and operate, and to use cash generated to accelerate construction and operation with or without any "partnership" or arrangement with other parties. Receiver steadfastly refused Havens' many offer to explain these matters so she could make informed judgments. Instead, Receiver maintained ignorance to sustain the pretext commenced by Leong and required to maintain the improper, harmful Receivership.

> Turnover will not benefit the creditors of Skybridge, for three reasons. First, as Havens acknowledges, the Licenses are worth less when managed separately than when managed together. Debtor's Licenses are most often disaggregated pieces of other licenses of the other entities. The two pieces are more useful together than separate. Turnover will mean that many licenses that should be managed together will be managed separately, thus reducing their value. Most of Debtor's creditors are the same as the creditors of the other Receivership Entities.
> Debtor and its principal, Havens, do not explain how separating Debtor's Licenses from the companion licenses of the other entities benefits any of the creditors. *Id.*, at ¶40.

49.    As to the first assertion, Receiver avoids acknowledging that it is only because Havens' formed Skybridge and the LLCs by which sufficient capital was raised to obtain the various synergistic licenses that added value was created. However, Skybridge does not require affiliation with the LLCs and their licenses for a highly valuable business case even if that added

value cannot be maintained due to Receiver's uninformed and improper plan to liquidate in fire sales the LLC licenses.  It would be her choice to not maintain that extra value.  Havens attempted to show her how to maintain that extra value, but she repeated chose to remain ignorant of even the most fundamental matters.  That appears to be why she says Havens acknowledges the extra value rather than stating that herself because she doesn't know what created the extra value and why there is extra value for reasons of improved technology, coverage, capacity, etc.

50.    Her point about the "two pieces" is uninformed and incorrect for reasons stated in n.3.  Turnover, contrary to Receiver's position, is the only way to maintain the substantial value in the licenses and any value in the sole business of the Debtor, which is its non-profit, public interest mission.  First, the Debtor is in the early stages of Phase Two of its business plan, where the vast majority of value lies ahead, and all of that will be lost by the Receiver's plan to liquidate, especially in a fire sale by an uninformed seller.

51.    Further, the obligation of a non-profit Debtor in bankruptcy is, in addition to properly resolving all legitimate creditor's claims, is to maintain its non-profit mission, which in this case could not be more aligned with the core goals of the FCC.  Receiver's claim that the FCC finds Havens to be some kind of problem could not be more at odds with Debtor's demonstrated unique pursuit of federal agency programs, including nationwide precision location and timing, and intelligent transportation systems (including Railroad PTC).

52.    Debtor's and the LLCs' respective licenses are issued by the FCC as distinct licenses for distinct geography areas and are each deemed viable under FCC rules.  They are not "companion licenses" under FCC law.  It is not clear what Receiver means by "separating" licenses that are already distinct or why that effects the interests of creditors where there is an

entirely clear means for the Debtor to pay all legitimate creditors, even solely with its current cash and without monetizing any of the licenses.

53.    In addition, it is the Debtor and several LLCs, prior to the Receivership, that negotiated several valuable 7-figure transactions with certain transportation companies which would have provided by now additional cash.    However, Receiver has not succeeded in completing those transactions and would hardly discuss them with Havens, who had negotiated them.

> Second, Havens has systematically allocated expenses of these entities away from Skybridge while cash and assets have been moved to Skybridge. This harms creditors of Skybridge who are also creditors of the other entities, as it deprives the other entities of cash and assets that can answer to the creditors' claims while putting cash in an entity with few allocated liabilities. *Id.*, at ¶41.

54.    False.    Again, as throughout her opposition, Receiver states very general conclusory allegations where one doesn't even know the real charges.    Expenses are not allocated away from Skybridge.    It pays its own FCC, legal counsel, accountant, and other expenses. Havens pays for any Atlis staff time for Skybridge work. Havens does most all of Skybridge's management, R&D, and other work, at no charge.  This is done in overtime hours above the full-time plus hours he spends on the LLC's work.  Therefore, there is no staff fees of Skybridge to allocate because Havens fully covers them.  Likewise, Haven's provides Skybridge with its own office facilities at a building separate from the LLCs' offices.  For these reasons, Skybridge is not served by Atlis, which performs cost allocation and accounting and other administrative services for some of the LLCs.  Again, Receiver apparently does not even read the detailed accounting provided to her, described above.

55.    Also, there's been no cash or assets moved to Skybridge.  It is remarkable that Receiver who has had control over these entities for roughly a half year and incurred over a

million dollars in professional fees, including her own, that she cannot state a claim of this kind with clarity and specifics.    That is probably since it is simply not true, which she must know. The Skybridge books and records, and its tax returns, were up to date prior to her filing of this opposition.

56.    The innuendo that cash and assets have been improperly "moved" to Skybridge is shown as incorrect in these records.    All of the license assets were properly assigned to Skybridge, as explained above.  In addition, Havens donated cash to Skybridge when needed. Finally, the majority of cash obtained by Skybridge including that turned over to Receiver, was the exact amount due to Skybridge in several license sales to Amtrak and Chesapeake Energy, and which Skybridge and several LLCs were joint sellers and for buyer's efficiency the joint sellers agreed that buyer would wire payment due at close to the LLC as the seller of the vast majority of the spectrum involved.  Then that LLC and Skybridge pro-rated that amount based upon an exact formula involving the units of spectrum each sold in that joint sale.  The units of spectrum were the standard measure in the wireless industry, called "MHz - Pops".  The LLC then transferred to Skybridge the exact amount due.

57.    There is nothing in these arrangements and action that deprives any LLC of any cash or assets, or disadvantages any creditors of any LLC or the Debtor.  These are all efficient, proper business transactions, fully shown in the entities' respective books and records.

> Third, Havens could have paid the creditors with proceeds from a sale of assets to Amtrak for over $6 million in May 2015. Instead, Havens took a payment of $1.25 million in "deferred salary" from one of his entities and left creditors of Debtor and the other Receivership Entities unpaid. Those creditors will be better off if Debtor's Licenses and cash are under unified management by the Receiver. *Id.*, at ¶42.

58.    False.  First, as explained above, the $1.25 million was entirely valid salary paid at the time it could be paid after Havens had deferred for benefit of the LLCs, with no security,

to allow them to maintain additional cash to achieve their Phase One success. That success enabled the sale to Amtrak referenced above.

59.    Receiver breached the confidentiality agreement with Amtrak by stating a figure for this sale in a publically-filed opposition. This is a significant professional breach and exposes both Debtor and the LLCs involved to potential claims.

60.    Further, it is false that there were creditors left unpaid at any time during Havens' management of the Debtor and the LLCs. There are parties alleging claims of payment due, which for good cause Havens disputed. Occasionally, a dispute resulted in a law suit. In those cases, because the dispute was legitimate due to claimant's breaches and resulting damages, Havens raised counterclaims for the entities involved. Apparently, Receiver is giving credence to creditor claims which is not warranted and which she doesn't even identify. However, Receiver, by her summary financial reports produced to Havens during the Receivership, is generating or accepting claims she cannot pay, which appears to be a first cause of her liquidation plan.

> The bankruptcy filing appears to be nothing more than an end run by
> Debtor's president and sole director, Havens, to make a collateral attack on
> the Receivership Order of the California Superior Court. *Id.*, at ¶43.

61.    First, the principal position of Havens in the Debtor is as its member, which in a non-profit is to protect its chartered mission. It is principally in that role that Havens pursues this bankruptcy, to protect it from improper attacks, first by Leong and then by his Receivership. Additionally, the Receivership Order, contrary to the allegation above, contemplates that Debtor may file bankruptcy and purports to provide a means by which Leong and Receiver can challenge the bankruptcy and resist turnover.

Havens should not be able to use the Bankruptcy Court simply to gain a tactical litigation advantage. *Id.*, at ¶44.

62.     Incorrect.  It is rather Receiver and Leong who should not be able to use the Receivership Order, improperly obtained in the first place by Leong, to interfere with Debtor's right to invoke federal bankruptcy protection permitting it to fully vet and resolve all legitimate claims and then resume its important business, free of improper attacks based on pretext, fraud, and FCC-preempted claims, as described above.  Further, Receiver is serially violating her own Receivership Order in egregious fashion exposing Debtor's and LLCs' licenses to potential loss rather than taking any actions at the FCC to protect them.

> The Receiver was also tasked with managing the Receivership Entities' position in the ongoing *Leong v. Havens* arbitration proceeding. This required obtaining over a decades' worth of materials, evaluating the claims and defenses, and working to determine what to do. After her review, the Receiver believed that the Receivership Entities were not so much parties with independent interests in the arbitration but rather constituted the property over which Leong and Havens had a dispute. The Superior Court reached a similar conclusion when it determined that Havens should direct and pay for litigating the position of the Receivership Entities. The court excused the Receiver from further involvement in the arbitration proceeding, something that the Receiver had sought from the outset of her appointment and that the court had initially denied. *Id.*, at n.10.

63.     The principal assertions and suggestions are false.  The court never "tasked" Receiver to manage the entities in the arbitration or review decade's worth of materials, etc. Rather, she told the court she could not do that due to the extent of materials and her alleged lack of funds for her and her attorneys.  Later, she asked the court to make Havens pay those fees, and the court summarily rejected that request as unfair to Havens.  After that, the court instructed Receiver that it had made a mistake in the initial Receivership Order with the broad injunction against Havens from continuing with any legal action for the entities and that it had not meant for that to apply the arbitration.  Therefore, the court orally ordered and subsequently signed a

modification order directing that Receiver shall have no role in the arbitration and may not address the merits of any party's claims or defenses therein.

64.    Whereas the court did, over objections of Havens' counsel, include in the modification order that if he chose to undertake defense and counterclaims in the arbitration for the entities, he would have to pay, the court made no "conclusion" or state any rationale for that requirement, contrary to the above assertion.  In fact, the court never squared the imposition of that requirement with its earlier finding that it would be unfair to make Havens pay such costs. In addition, Receiver fails to note that Havens' attorneys explained to the judge in a letter after the hearing and before the judge issued the order, that Havens had advancement and indemnification rights in the LLC agreements he had signed with Leong.  The judge's imposition on Havens to pay the entities' legal fees in the arbitration conflicted with his advancement and indemnification contractual rights.  The court has not addressed this matter.

> Regarding tax and financial management, one of the challenges faced by the Receiver is that there are no apparent rules by which Havens allocated expenses among the Receivership Entities. The Receiver is in the process of attempting to reconstruct the Receivership Entities' books and records with the help of a tax accountant in order to file tax returns for the Receivership Entities. She had noted prior to Debtor's filing for bankruptcy that its last tax return was filed for the 2012 tax year and that it had been stripped of its tax exemption by the IRS. *Id.*, at ¶49 (footnotes omitted).

65.    All of these charges are incorrect, and are addressed above.  The only Receiver may be "in the process of attempting to reconstruct … books and records" is that she is not looking at the actual books and records given to her, and simply will not engage Debtor's and the LLCs' accountant to explain any missing information.  Again, as noted above, the IRS never "stripped" the Debtor of tax-exemption.  Receiver's use of that inflammatory word reveals her desire to see such a loss, despite Havens demonstration to her that the action was a simple error.

Havens has asserted that the IRS erred in revoking the exemption. He has also informed the Receiver that, in a previous similar situation, the IRS restored the exemption. As these situations arise from the chronic lateness of Debtor's tax returns, the Receiver planned to become current on all tax filings for Skybridge before its bankruptcy filing. The Receiver does not believe that being chronically behind on the Debtors' annual tax returns is a proper way to manage this entity. *Id.*, at n.13.

66.     Debtor was never late under the subject IRS three-year rule that applies to non-profit exempt entities. Debtor must obtain from the LLCs K-1's to complete its returns and in some cases obtain valuation of conservative market values of donated assets, including licenses.

67.     The LLCs had good cause in certain years to complete review by accountants and tax counsel, which caused LLCs' returns in some years to be late and thus causing a delay in the availability of K-1s. Two accountants for the LLCs, for their own reasons, became unavailable. One left the U.S. Another restructured its business and was no longer available. Each time the transition to new a new accountant took time because of the need to review substantial records and interview the client on its fairly unique and complex business with multiple types of membership, many cost allocations for various types of transactions, various "recourse" and "non-recourse" loans. Additionally, the long-term tax counsel for Debtor and the LLCs, a sole practitioner, left private practice to become inside counsel for a new technology company on little notice. Havens had to interview and chose replacement counsel, this time from a substantial size law firm to minimize the risk of future loss of counsel, and then supply records and lengthy transitional interviews for new counsel to get up to speed.

68.     For new companies expanding quickly, like Debtor and the LLCs (growing 1000-fold in assets and value in roughly a decade), being late on aspects of complex accounting and tax returns is not uncommon. The entities could have timely competed returns without the accuracy, care, professional review and guidance that Havens undertook and completed.

69.    Additionally, neither Leong nor any other actual or alleged interest-holder nor Receiver has alleged or shown prejudice on account of some late returns. Leong acknowledges the huge success achieved to create the current values, but on the other hand diligently endeavors to find any errors along the way. He is like a stock market investor whose broker achieved in his portfolio a huge return, but then seeks out errors or deficiencies, actual or imagined.

> In addition, certain of the entities have been subject to IRS audits for certain tax years since the Receiver's appointment. The Receiver is diligently working to respond to the IRS's inquiries. *Id.*, at ¶50 (footnote omitted).

70.    Again, it is incredible that Receiver cannot even name the entities and years of the alleged audits and inquiries. The only entity and year subject to IRS audit known to Havens is Verde Systems, LLC for 2011. As to that audit, it was properly and efficiently undertaken by Havens and Verde's accountant before the Receivership began. After the Receivership, however, Receiver failed to respond to the auditor for many months. The auditor then contacted Havens multiple times, including once where James Stobaugh, former General Manager of Verde was involved, in long phone calls explaining that she was getting no response from Receiver despite many phones calls and letters, and had never in her long career experienced such avoidance at all. The Auditor told Havens that she desired to finish the audit with Verde's accountant, Jose Nunez, with whom she was comfortable. Havens responded that he had proposed exactly that to Receiver several times -- that Receiver engage Nunez with any oversight required. With no explanation, Receiver did not agree but instead tries to recreate on her own records, information, and analysis had on hand or could quickly come up with to complete this simple audit. There are other troubling aspects of Receiver's mis-management and delays in this audit that are too extensive to note.

> Havens incorrectly asserts that the Receiver did not respond to a
> "deadline" of the FCC's Office of General Counsel regarding an inquiry
> about the Sippel Order.  See Havens Supp. Declaration (Docket No. 70),
> ¶24.  In fact, the Receiver, through counsel, was in close touch with the
> FCC regarding her input on that issue.  The Receiver filed a pleading
> in March 2016 asking that the Commission not issue an HDO to allow her
> to work toward the agency's goals for the spectrum assets.... *Id.*, at n.17.

71.    This is a mischaracterization.    There was a deadline that Receiver missed by a long period.  To this day, Receiver has never responded to the inquiry which asked for her position regarding her appeals of the Sippel Order.  Her "stay - sale" proposal stated she would not address the merits of the Sippel Order and appeals, but indirectly necessarily meant she believed the Sippel Order had merits.

72.    Further, her comment about being in "close touch" with the FCC is an admission of unlawful ex parte communications in a restricted proceeding because the appeals of the Sippel Order involved a contested right of the appellants, including Havens individually.  It is unlawful under FCC rules and the Administrative Procedures Act for any person to address the merits of or even the timing of a pending matter of this nature before the FCC, unless it is by a party with standing with permitted-party rights that properly serves all other parties.  One cannot engage in undisclosed "close touch" communications with the FCC on any such matter.

73.    Receiver did not even serve a copy of her "stay - sell" request on counsel to Havens and the Debtor in the Sippel appeal, attorney Jeff Blumenfeld.  Further, Receiver wrote to Havens that she will not provide to him copies of her filings before the FCC in matters which involve him as a party and that he would have to seek copies from the FCC on his own by occasional review, and that she would not even inform him of public filings or "close touch" communications and meetings with the FCC that affected his interests.

74.    Receiver suggests there are undefined "agency goals" for the spectrum assets. Receiver's proposal is contrary to agency goals for these licenses and classes of licenses. For example, the goals for the LMS licenses are for advanced intelligent transportations systems and Havens successfully defended the agency's rules to implement the goals in a 10-year rulemaking proceeding called Docket 06-49 against opponents who attempted to undermine these goals and rules including Leong's niece and business partner, Helen Wong Armijo and Leong's primary business associate, Bill Peirce, who appeared as Armijo's representative in that long proceeding. A fire sale of the licenses does not promote that goal. High precision location and timing is accepted as the foundation of intelligent transportation systems ("ITS"). This is demonstrated in detail by a major study conducted and publish by three leading professors at University of California, Berkeley, which was commenced and largely funded by charitable donations and service contributions from Havens, Debtor, and the LLC. This is further demonstrated at Debtor's website, <terranautx.com>.

75.    Further, Receiver's "stay - sell" proposal directly conflicts with the FCC's rule and underlying goal that bars any relief for selling and assigning spectrum. There is nothing in the FCC's goals and rules to support Receiver's claim that her proposal works towards the agency's goals. Rather, it is a futile claim due to the requirements of Section 309(d) of the Communications Act, explained above. It is further futile, and therefore frivolous, because the FCC cannot grant any stay of the appeals from the Sippel Order by Havens and the Debtor because Receiver cannot not and does not speak for either as to their appeals.

76.    Even if Receiver is permitted to retain control of Debtor's licenses in this bankruptcy, under the Receivership Order, she has no control over Havens' individual right and interest, including his individual defense of the charges contained in the Sippel Order via his

appeal.  Because the appeals of the Sippel Order are for Havens individually, along with the

Debtor and the LLCs, even if the FCC stayed a decision as to the entities Receiver controlled, it

would not stay a decision as to Havens and Debtor, thus Receiver's stay request is ineffective.

Exhibit 9 of Havens' Second Supplemental Declaration of April 29, 2016 contains two formal

requests submitted by Havens and Debtor as to why Receiver's "stay - sell" proposal is futile and

frivolous, and why the Sippel Order simply cannot be applied to Skybridge as a non-participant

in the Sippel Hearing regarding the actions the judge criticized.

> Many of the Licenses are either expired with renewal applications
> pending, subject to renewal this year, or face construction or in-service
> deadlines. The principal licenses assets of Debtor and the other
> Receivership Entities are:
>
> • 34 AMTS licenses (17 in the name of Debtor) – 22 of these (11 of
> Debtor) had an expiration date on April 26, 2015 and have renewal
> applications pending while an additional 12 licenses (6 of Debtor's) have a
> December 29, 2016 expiration date;
>
> • 704 MAS licenses (352 in the name of Debtor) – Debtor's licenses had
> an expiration date of March 29, 2016 and have renewal applications
> pending;
>
> • 257 LMS licenses (128 in the name of Debtor) – Debtor's licenses have
> a deadline for filing construction notices on September 4, 2016. Of these,
> 67 licenses (33 of Debtor's) have an expiration date of March 9, 2017; and
>
> • 4,132 paging licenses (266 in the name of Debtor) – 2,133 of these
> licenses (133 of Debtor's) had an expiration date of November 3, 2015
> and have extension applications pending. Id., at ¶68.

77.    Receiver falsely alleges that some of the licenses are expired with renewal

pending.  That appears to be another example of deliberately incorrect inflammatory language.

Licenses that are pending renewal continue in full force and effect unless and until a decision is

made denying the application.

78.    Regarding AMTS licenses, Receiver makes no point except to falsely suggest that there is an "expiration date". There is a renewal date at the end of the term of all licenses, but licenses do not expire on the renewal date unless a renewal application was not submitted.

79.    Regarding the MAS and LMS licenses, the same regarding "expiration" applies. As to the LMS licenses, first, Receiver spent weeks in making false assertions to Havens and in motions to the court for permission to sell Telesaurus Holdings' LMS licenses (by far the largest group of licenses among the Receivership entities) with a construction deadline of this fall. Havens had to repeatedly demonstrate what is clear on the fact of the licenses and in an unambiguous order on these LMS licenses, that they have no construction obligation or deadline. When the court would not sign Receiver's initial proposed order, based on this false assertion, Receiver in a subsequent week gave up the false claim in a modified proposed order. (As noted below, Receiver used similar false claims regarding roughly have of the paging licenses.) Also, the September 2016 deadline is for either filing a notice of construction for which the actual standard is "substantial service" or good cause for an extension. There is compelling good cause already clear in FCC records for an extension of the LMS licenses, as partly indicated above.

80.    While Receiver has abandoned all of Debtor's and the LLCs' business and technical R&D, which are among the compelling good reasons for a substantial extension of the September 2016 deadline, in this bankruptcy the Debtor can demonstrate to the FCC why it was improperly set back by such abandonment and the need to revive those activities after that loss of time and momentum. The FCC does grant relief of this nature to a licensee in bankruptcy. This is an important benefit that bankruptcy bestows and that receivership does not. In turn this is another reason why creditors, including those with disputed claims that may take some time to resolve, will be better served by turnover.

81.     As to the paging licenses, again, Receiver improperly asserts expiration.  But she fails to explain that she falsely and repeated asserted to Havens and his California counsel and in motions in the court action that the second group of these licenses, which she fails to mention above, had a fall 2016 construction/extension deadline and that it could not be satisfied. Receiver was ultimately forced to acknowledge that her assertions to Havens and the court were false at a second hearing on her request to sell licenses -- that there was no fall 2016 construction/extension deadline.  Instead, as Havens repeatedly showed, that deadline was merely a date for electing a five-year construction deadline instead of a three-year default deadline.  The rule provided for an election under right for cause or no cause.

82.     Havens further showed that for the first group of these licenses, which Receiver comments on above, Havens made this simple election and it was promptly granted as a matter of right.  Instead of acting in any semblance of professional objectivity, Receiver subjected Havens and the court to weeks of this pretense.  This would not be tolerated in any federal bankruptcy court.

> In sum, by the end of this year, all of the AMTS licenses will require FCC approval for renewal; all of the MAS licenses will require FCC approval for renewal; and about half of the paging licenses will require FCC approval for renewal. Half of the LMS licenses have an interim construction deadline in September and expire in less than a year, in March 2017. Every one of these deadlines requires the FCC to exercise its discretion favorably or the Licenses could be extinguished. Id., at ¶69.

83.     That is true for all FCC licenses, apart from those that are purely elective, which are a sort of notice rather than application.  However, as shown herein, it is Receiver and Leong that are increasingly and seriously abandoning the compelling good causes that the entities had built up pre-Receivership and exposed them to risk by wrongful actions of Leong and Receiver under FCC law.  As noted above, Debtor can obtain from the FCC in this bankruptcy reasonable

relief from those improper actions that compromise Debtor's ability to obtain favorable FCC discretion.

> In addition to these regulatory risks that pose a threat to particular Licenses, the potential issuance of an HDO is a catastrophic risk. The FCC could issue one at any time and whether the FCC does or does not issue such an order is entirely within the FCC's discretion. If an HDO is issued, its adjudication could take years, if the ongoing adjudication of an HDO against MCLM that has involved Havens and the Receivership Entities is any indication. *Id.*, at ¶70 (footnote omitted).

84.    This is incorrect for the reasons given above.  Rather, it is Receiver and Leong that are imposing increasing risk before the FCC which this bankruptcy will enable Debtor to seek relief from before the FCC.

> If an HDO is issued against Havens, all Licenses held by all of the entities, including the Debtor, will be frozen pending the determination as to Havens' character. No transfers will be possible, except in extremely narrow circumstances where an overriding public interest would be served. This is because, under the FCC's *Jefferson Radio* doctrine, a transfer of a license that would result in a monetary benefit to an alleged wrongdoer is not allowed. *Id.*, at ¶71.

85.    This is incorrect for the reasons given above.

> Havens does not appear to take the Sippel Order seriously. He refers to it as "nonfinal" and subject to "reconsideration and an appeal." Debtor's Motion, ¶ 42.  His assertion that he simply "ticked off a judge" and it is "preposterous" that doing so could make him unfit to hold FCC licenses is hardly an attitude of someone to be entrusted to navigate very difficult regulatory waters ahead for Debtor.  His "damn the torpedoes, full speed ahead" approach to solving problems of his own creation is likely to result in greater suffering for the creditors. *Id.*, at ¶72.

86.    By her phrasing, Receiver suggest that the Sipple Order is final.  But it is not.  It is subject to reconsideration and appeal.  The record in the Sippel Hearing is carefully addressed in the pending appeals and shown to lack support for Judge Sippel's findings and two component order, one to remove Havens and the entities from the hearing (all but two of which were not even active, but had the right to seek active participation) and the other to refer a question of

qualifications to the Commission. The record does not show any good reason for Judge Sippel to draw his conclusion as to Havens for any reason other than he appeared "ticked off".

87.     Tellingly absent from Receiver's bold challenge is any detail as to why Sippel is correct on the facts and law and why the detailed analysis on appear are not correct. This shows that Receiver desires to use the Sippel Order as a pretext, noted various places herein. Further, as also shown herein, Havens and the participating LLCs won the hearing an cleared off massive unresolved proceedings before the Wireless Bureau and prevailed before the full Commission on the subject of the second phase of the Sippel Hearing, which are Maritime's geographic licenses with regard to Maritime's attempt under the "Second Thursday" Doctrine to escape that second phase. Also, by the carefully prepared appeals, which were under special grant by the Office of General Counsel, of the requests submitted by counsel for Havens and the entities (as to extra page-length and timing) Havens showed he seriously and capably addressed the fallacies and abuse of discretion in the Sippel Order. That is taking the Sippel Order seriously.

88.     On the other hand, Receiver has shown no analysis of the Sippel Order or the appeals before the FCC, or the California court, or this Court. Rather, the Receiver's "stay sell" proposal to the Commission implies that the Sippel Order has merit, which means Receiver is taking the side of Maritime (who directly supported the Sippel Order and opposed the appeals) and against the entities she is supposed to protect.

89.     Receiver's "damn the torpedoes" characterization is more of her smear campaign. Instead, Receiver's only proposal to the FCC is damn the companies if she has to, to sell the licenses and take the money and run for Leong. Her "stay - sale" proposal is patently ineffective and frivolous, as elsewhere shown herein. She cannot support the clearly meritorious appeal without undercutting the basis of her Receivership, which is the pretense that the Sippel Order is

correct and avoidance of the fact that Havens and the participating LLCs won the hearing for the

full Commission's stated goals and the HDO that governs the Sippel proceeding.

> The Sippel Order is not the only instance of Havens' being sanctioned by
> the FCC.  In 2012, in Docket No. DA-12-1376, the FCC denied a petition
> to reconsider a sanctions order against Havens. It included the following
> summary of the lengthy proceedings to that point:

>> Havens has been challenging the Commission's denial of
>> his applications for certain AMTS licenses for more than a
>> decade. On July 22, 2011, the Commission released its
>> *fourteenth order* relating to those license applications. The
>> order was the agency's *fifth dismissal* of Havens'
>> challenges to the Commission's dismissal of a Havens
>> reconsideration petition in the licensing proceedings.
>> Havens acknowledged that he had filed his petition after
>> the 30-day deadline prescribed by section 405(a) of the
>> Communications Act. In that order, the Commission
>> dismissed Havens' *fifth challenge* to the agency's dismissal
>> of a Havens reconsideration petition in the licensing
>> proceedings, concluding that *Havens had abused the
>> Commission's processes by filing frivolous and repetitive
>> pleadings* and proposed to sanction Havens by prohibiting
>> him, or any person acting on his behalf, from filing further
>> pleadings in the licensing proceedings without prior
>> approval of the Bureau.

> *Id.*, at ¶73.

90.    This is substantially misleading for the following reasons:  In the Commission's

decision in this matter, the Commission made clear that its so-called "sanctions" were no more

than a requirement that Havens state in future filings in this matter that he submits them with

good cause under essentially the same standard that applies to attorneys in an FCC rules on

attorney-signed pleadings.  All of Havens' filings go beyond that requirement even when the

rules do not require that.  Havens voluntarily accepts that higher standard to demonstrate that all

the pleadings he submits are well thought out and he stands ready to defend both the facts and

legal argument.

91.    The above claim that a thirty-day deadline was missed is correct, but it is incorrect that Havens missed the deadline. Instead the record shows that the Hogan & Hartson law firm, which represented Havens, had missed the deadline in filing that petition. That firm submitted a declaration that its computers went down right before the filing deadline and that it could not complete and print the filing by that day's deadline and instead submitted it at the commencement of the next day with no loss in business hours. The FCC policies and precedents to accept nominally late filing for good causes as this where the represented client is not at fault. The FCC never explained why it deviated from that obviously-proper standard in this case.

92.    In addition, the full Commission had issued a major precedent that its rule for reconsideration permitted acceptance of a late-filed petition where the substance shows good cause and the public interest for the FCC to decide the matters posed. The FCC did consider in Havens' multiple request for consideration that he was posing substantial issues with relevant new facts not yet decided upon, and tenaciously refused to recognize the Commission's own precedent to accept late-filed petition if the content poses important matters in the public interest.

93.    This proceeding was substantially parallel to an aspect of the Sippel Hearing regard the coverage- construction requirement for AMTS site-based licenses. By pursuing this appeal, Havens was able to better maintain a position that the Commission must apply equally to Maritime the decision it made regarding Havens' AMTS site-based license applications, which supposedly enforced the construction-coverage requirement to Havens that it had not imposed on Maritime's predecessors. Imposition of that requirement was an issue in the Sippel Hearing. This is a matter Havens raised in these successive appeals in order to more effectively maintain them in the Sippel Hearing, ultimately, as noted elsewhere herein, Havens was successful at getting Maritime to admit to failures under the construction and operation requirement. In this

fashion, the successive appeals in this matter were successful. Likewise, the successive appeals also enhanced the claims asserted by Debtor and the LLCs against the affiliate of Maritime, PSI, which also ended up surrendering virtually all of its AMTS licenses, clearing those encumbrances to Debtor's and the LLC's geographic AMTS licenses.

94.    Finally, Receiver ignores that after the events she cites to in this matter, Havens, for the Debtor and LLCs, won all major proceedings before the FCC to achieve success in Phase One of the business plan, some of the major decisions of which are listed in Appendix C to Havens' Declaration in Support of Petition.    This demonstrates that he FCC was not adverse to Havens as a result of the above-discussed proceeding.

> Havens could continue to fight against the Sippel Order and the issuance of an HDO without turnover of Debtor's assets. The Receiver understands he was doing this already, as she met Havens' lawyer involved in appealing the Sippel Order. As he acknowledges, it arises from his actions as a pro se litigant against an entity called MCLM. He neither needs nor is entitled to use the cash assets of Debtor to fund his litigation activities against the FCC. *Id.*, at n.19.

95.    False.    The Sippel Order is against the Debtor, the LLCs, and their licenses, as well as against Havens individually.    The specific substantial complaint in the Sippel Order are against the actions and pleading of James Stenger of the Chadbourne law firm on behalf of two LLCs.    Judge Sippel ordered that the entities needed legal counsel in order to participate and, with objections politely stated, Havens complied.    Similarly, Havens arranged for highly-experienced counsel to prepare and file the primary appeal pleadings.    Those entities have obligations to pay counsel.    All of the appellants share the costs of legal counsel.    This is not "Havens'" fight.

> Havens asserts "82% success" against MCLM in that particular proceeding. Debtor's Motion, ¶ 14. While it is true that Havens appears to have instigated an action that has benefited the entities to that extent, his overzealous pursuit of the remaining 18% of MCLM's licenses has

resulted in a potentially catastrophic outcome for Debtor and the other Receivership Entities. *Id.*

96.     Judge Sippel did not assert an "overzealous pursuit" of the 82% by Havens.  But if Receiver believes that, then she must understand that it was James Stenger, not Havens, that handled that phase of the hearing.  Havens told Judge Sippel long before that phase (the in-person trial phase) that he would secure counsel to assure the judge that the more complex trial phase would be handled by experienced counsel.  The judge asked Havens to let counsel take the lead and only play a pro se role coordinated with counsel to maximize efficiency.  Haven complied.

> Havens' apparent inability to work in a consistently cooperative fashion with the regulatory body whose decisions determine whether the Licenses are extinguished or not is difficult to understand. The Receiver believes that Havens' historically combative approach with the FCC is not be the one that is most beneficial to creditors in the current circumstances.  *Id.*, at ¶74.

97.     Receiver only suggests apparent and believed things, which is improper in a serious opposition.

98.     The reply comments herein clearly show that Havens effectively prosecuted the cases for Debtor and the LLCs in winning the major decisions, including the Sippel Hearing.

99.     Havens' approach is not at all combative, as Congress expected and encouraged by the 1994 Telecom Reform Act, as discussed elsewhere herein.

100.    Receiver is tellingly silent on her own experiences and successes before the FCC because substantial to show, and nothing at all in connection with these radio services or other similar forms of wireless.  Among scores of qualified persons, such as former Commissioners, one of whom Havens proposed as Receiver in formal pleadings to the court, Leong picked

someone who has shown to carry on Leong's unlawful claims., which as to Skybridge, are transparently contrary to both FCC and IRS law.

101.    Further, a review of cases brought by Receiver and Leong in the federal court PACER system is instructive.

> In the past, entities under the control of Havens have lost licenses due to the failure to meet regulatory requirements. For example, Environmentel LLC sought an extension of a five-year construction deadline for a series of 43 220 MHz licenses. In a March 2014 decision, the FCC declined to grant an additional forty-five month construction deadline extension and extinguished these licenses. Exh. L (FCC Decision No. DA-14-380). Id., at ¶76.

102.    Again, Receiver cannot even name the entities under Havens' control, except for one example.  As to her example, the decision is on appeal for good cause, which, as with all other matters Receiver complains of, she provides no detail or analysis.

103.    The quantity of spectrum in these licenses is less than 1/10th of 1% of the spectrum quantity in all of the licenses, and almost an immeasurably small quantity of value across all the licenses.

104.    Havens used conservative business to not through extensive money into construction of this small quantify of licenses, which cost would have vastly exceeded the total value of those licenses, and instead applied those funds to clearing encumbrances of the valuable licenses in Phase One, as described elsewhere herein.  Licenses obtained in public auctions with unknown future technical, regulatory and business conditions, are somewhat like picking stocks in new companies and industries.  Sometimes the wise choice is not to maintain all positions, but focus on ones that develop into the most promising and valuable prospects.

105.    While there are other similar vague and conclusory accusations in the Turnover Objection, unsupported by detail or a declaration, the specific replies provided herein which do

have details and support of a declaration, demonstrate the that the opposition fails except to show compelling good cause to grant the Turnover Motion for protection of the creditors and this non-profit Debtor as an ongoing concern for the national public interest.

## **CONCLUSION**

**WHEREFORE,** Debtor respectfully requests this Honorable Court enter an order (i) granting the Turnover Motion and (ii) granting to Debtor such other and further relief as the Court deems just and proper.

Date:  May 4, 2016
   Wilmington, DE

        SULLIVAN · HAZELTINE · ALLINSON LLC

          /s/ E.E. Allinson III
        Elihu E. Allinson III (No. 3476)
        901 North Market Street, Suite 1300
        Wilmington, DE 19801
        Tel: (302) 428-8191
        Fax: (302) 428-8195

## Declaration

I, Warren Havens, declare until penalty of perjury that the facts stated herein are true and correct to the best of my knowledge, information and belief.

/s/ Warren Havens,

Member, Director, and President of the Debtor

Dated:  May 4, 2016

Wilmington, Delaware

## CERTIFICATE OF SERVICE

I, Elihu E. Allinson III, do hereby certify I am not less than 18 years of age and that on this 4th day of May 2016, I caused a copy of the *Reply in Support of Debtor's Motion Compelling Custodian to Turn Over Property of Debtor's Estate* to be served upon the parties listed on the attached service list via First Class U.S. Mail. Postage pre-paid.

I declare under penalty of perjury that the foregoing is true and correct.


May 4, 2016                                    */s/ E.E. Allinson III*
Date                                           Elihu E. Allinson III

**Skybridge Spectrum Foundation**
**Case No. 16-10626 (CSS)**
**Service List**

Eric D. Schwartz, Esq.
Curtis S. Miller, Esq.
Tamara K. Minott, Esq.
Marcy J. McLaughlin, Esq.
Morris, Nichols, Arsht & Tunnell LLP
1201 North Market Street, Suite 1800
Wilmington, DE 19801

Bradford J. Sandler, Esq.
Peter J. Keane, Esq.
Pachulski Stang Ziehl & Jones LLP
919 N. Market Street, 17th Floor
Wilmington, DE 19801

Anne Gwal Esq.
Pepco Holdings Inc. Service Company
500 N. Wakefield Drive 92DC42
PO Box 6066
Newark, DE 19702

Marlene Dortch, Secretary
Federal Communications Commission
445 12th Street, SW
Washington, DC 20554

Steven R. Secrist, Esq.
Puget Sound Energy
10885 NE 4th Street
Bellevue, WA 98009-9734

Robert M. Jacobs, Esq.
Winne Banta
Court Plaza South - East Wing
21 Main Street, Suite 101
P.O. Box 647
Hackensack, NJ 07601-0647

David Gerardi, Esq.
United States Trustee
J. Caleb Boggs Federal Building
844 N. King Street, Suite 2207, Lockbox 35
Wilmington, DE 19801

Dean A. Ziehl, Esq.
Jeremy V. Richards, Esq.
Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA 90067-4100

Ms. Susan Uecker
Uecker & Associates, Inc.
1613 Lyon Street, Suite A
San Francisco, CA 94115

Stephen Hudspeth, Esq.
6 Glen Hill Road
Wilton, CT 06897

William H. Leech, Esq.
Copeland Cook Taylor & Bush
1076 Highland Colony Parkway
Concourse 600, Suite 100
Ridgeland, MS 39157

W. Patrick Doherty, Esq.
National Railroad Passenger Corporation
40 Massachusetts Avenue, NE
Washington, DC 20002

**Skybridge Spectrum Foundation**
**Case No. 16-10626 (CSS)**
**Service List**

David Pierce, Esq.
Axiom Global Inc.
405 Howard Street, Suite 650
San Francisco, CA 94105

Mr. Michael Lannan
PTC-220, LLC
2400 Western Center Boulevard
Fort Worth, TX 76131-1322

Gary Young, Senior Project Manager
GE Transportation Systems Global Signaling LLC
2712 S. Dillingham Road
Grain Valley, MO 64029

Raphael M. Rosenblatt, Esq.
Rosenblatt Law PC
21 Main Street
Court Plaza South, Suite 305
Hackensack, NJ 07601

Barry Coburn, Esq.
Coburn & Greenbaum PLLC
1710 Rhode Island Avenue NW, 2nd Floor
Washington DC 20036

ATLIS Wireless LLC
c/o Susan Uecker, Receiver
1613 Lyon Street, Suite A
San Francisco, CA 94115

Ms. Susan Uecker
1613 Lyon Street, Suite A
San Francisco, CA 94115

David Steele, Esq.
Perkins Coie LLP
The PSE Building
10885 N.E. Fourth Street, Suite 700
Bellevue, WA 98004-5579

Mr. Arnold Leong
3111 Green River Drive
Reno, NV 89503

Maureen Donahue Hardwick, Esq.
Drinker Biddle & Reath LLP
1500 K Street, N.W., Ste. 1100
Washington, DC 20005-1209

Adam R. Bernstein, Esq.
198 Coffeeberry Drive
San Jose, CA 95123

Dana Frix, Esq.
Chadbourne & Parke LLP
1200 New Hampshire Avenue NW
Washington, DC 20036

Jeffrey Blumenfeld, Esq.
Lowenstein Sandler
2200 Pennsylvania Ave. NW
Washington, DC 20037

David DeGroot, Esq.
Sheppard, Mullin, Richter & Hampton LLP
Four Embarcadero Center, 17th Floor
San Francisco, CA 94111

Alan D. Smith, Esq.
Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099

Marc S. Sacks, Esq.
U.S. Department of Justice
Civil Division
P.O. Box 875
Ben Franklin Station
Washington, DC 20044-0875

**Skybridge Spectrum Foundation**
**Case No. 16-10626 (CSS)**
**Service List**

Daniel J. Carrigan, Esq.
Baker Donelson Bearman Caldwell
  & Berkowitz, PC
901 K Street NW, Suite 900
Washington, DC 20001

Thomas F. Driscoll III, Esq.
Ian Connor Bifferato, Esq.
BIFFERATO LLC
800 N. King Street, Plaza Level
P.O. Box 2165
Wilmington, DE 19899-2165